**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------------ X | Lead Case No. 07-CV-10464 (LAP) |
| IN RE AMERICAN INTERNATIONAL GROUP, INC. 2007 DERIVATIVE LITIGATION | : : (Derivative Action) : |
| _____ | : : VERIFIED CONSOLIDATED |
| This Document Relates To: | : SHAREHOLDER DERIVATIVE : COMPLAINT FOR BREACH OF |
| ALL ACTIONS. | : FIDUCIARY DUTY, WASTE OF : CORPORATE ASSETS, UNJUST : ENRICHMENT AND VIOLATIONS OF : THE SECURITIES EXCHANGE ACT OF : 1934 |
| | : : |
| ------------------------------------------------------------ X | DEMAND FOR JURY TRIAL |

Plaintiffs, by their attorneys, submit this Verified Consolidated Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by shareholders of American International Group, Inc. ("AIG" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 (the "Exchange Act") that occurred between May 2006 and the present (the "Relevant Period") and that have caused substantial monetary losses to AIG and other damages, such as to its reputation and goodwill.

2.     AIG provides a wide range of financial and insurance services. During the Relevant Period, AIG's business prospects suffered due to the Company's exposure to the subprime mortgage crisis. Nevertheless, AIG, under defendants' direction, improperly concealed the true extent of that exposure. In fact, throughout the Relevant Period, defendants claimed that AIG's portfolio was so sufficiently diversified that the mortgage market would have to reach "Depression proportions" before it negatively impacted the Company. Defendants also claimed that AIG's improved "financial control environment" would provide "greater transparency" in the Company's financial disclosures.

3.     AIG was not as invulnerable as defendants claimed, however. Indeed, on November 7, 2007, AIG announced that its third fiscal quarter 2007 earnings were 27% lower than what the Company had earned in the prior year. These disappointing results were driven by approximately *$1.4 billion* in losses in AIG's investment portfolios and mortgage insurance business.

4.     While defendants were directing AIG to issue improper statements concerning its exposure to the subprime market crisis, they were also directing AIG to repurchase over $3.7 billion worth of its own shares at artificially inflated prices. Even worse, certain of the defendants sold their personally held shares while in possession of material non-public information for over $6 million in proceeds.

-1-

5.      Currently, AIG's credibility with investors is in shambles.  During the Relevant Period, the Company's value has declined from over $72 per share to less than $60 per share—a $30 billion market capitalization loss.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between the plaintiffs and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

7.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) AIG maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to AIG occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

-2 -

## THE PARTIES

9.       Plaintiff Doris Staehr is and was, at times relevant hereto, an owner and holder of AIG common stock. Plaintiff is a citizen of California.

10.      Plaintiff Marilyn Clark is and was, at times relevant hereto, an owner and holder of AIG common stock. Plaintiff is a citizen of California.

11.      Nominal defendant AIG is a Delaware corporation with its principal executive offices located at 70 Pine Street, New York, New York. AIG provides a wide range of insurance and financial services.

12.      Defendant Martin J. Sullivan ("Sullivan") is AIG's President and Chief Executive Officer ("CEO") and has been since 2005. Sullivan is also an AIG director and has been since 2002. Sullivan was AIG's Vice Chairman and Co-Chief Operating Officer from 2002 to 2005; and Executive Vice President, Foreign General Insurance from 1998 to 2002. From 1971 to 2002, Sullivan held various positions with AIG. Because of his positions, defendant Sullivan knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Sullivan participated in the issuance of improper statements, including the preparation of the improper press releases and Securities and Exchange Commission ("SEC") filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Sullivan received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $1,000,000 | $10,125,000 | $1,370,657 | $1,916,232 | $5,838,656 | $275,701 | $703,432 |

Defendant Sullivan is a citizen of New Jersey.

13.      Defendant Edmund S.W. Tse ("Tse") is AIG's Senior Vice Chairman-Life Insurance and has been since 2001. Tse is also an AIG director and has been since 1996 and is Chairman of American International Assurance Company, Ltd. Tse was AIG's Co-Chief Operating Officer in

-3-

2002; Vice Chairman, Life Insurance from 1997 to 2001; and from 1961 to 1996, Tse held various positions with AIG. Because of his positions, defendant Tse knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Tse participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Tse received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $849,729 | $1,838,455 | $3,729,295 | $3,354,527 | $5,860,619 | $193,060 |

Defendant Tse is a citizen of New York.

14. Defendant Win J. Neuger ("Neuger") is AIG's Executive Vice President and has been since May 2002. Neuger is also AIG's Chief Investment Officer and has been since 1995. Neuger was AIG's Senior Vice President from 1995 to May 2002. Because of his positions, defendant Neuger knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Neuger participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Neuger received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $942,000 | $1,613,000 | $1,499,042 | $1,519,196 | $2,930,309 | $252,127 | $33,070 |

Defendant Neuger sold 59,492 shares of AIG stock for $4,186,906.71 in proceeds while in possession of material non-public information. Defendant Neuger is a citizen of New York.

-4-

15. Defendant Frank G. Wisner ("Wisner") is AIG's Vice Chairman – External Affairs and has been since 1997. Because of his positions, defendant Wisner knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Wisner participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Wisner sold 16,874 shares of AIG stock for $1,222,183.82 in proceeds while in possession of material non-public information. Defendant Wisner is a citizen of New York.

16. Defendant Brian T. Schreiber ("Schreiber") is AIG's Senior Vice President – Strategic Planning and has been since May 2003. Schreiber was AIG's Vice President – Strategic Planning from 2002 to May 2003. From 1997 to 2002, Schreiber held various positions with AIG, including Portfolio Manager of AIG's Global Investment Group and Managing Director of the Global Investment Group Corporate Acquisitions and Investments Group. During the Relevant Period, AIG's investment and credit swap portfolios lost over $1.2 billion in value because of the Company's investment in mortgage backed securities. Because of his positions, defendant Schreiber knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Schreiber participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Schreiber sold 3,500 shares of AIG stock for $243,075 in proceeds while in possession of material non-public information. Defendant Schreiber is a citizen of New York.

17. Defendant Steven J. Bensinger ("Bensinger") is AIG's Executive Vice President and Chief Financial Officer ("CFO") and has been since March 2005. Bensinger was AIG's Senior Vice President from January 2005 to March 2005; Comptroller in 2005; and Treasurer from 2002 to 2005. Because of his positions, defendant Bensinger knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about

- 5 -

the business of AIG. During the Relevant Period, Bensinger participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Bensinger received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $750,000 | $3,250,000 | $757,690 | $617,358 | $2,093,078 | $108,143 | $18,323 |

Defendants Bensinger is a citizen of New York.

18. Defendant William N. Dooley ("Dooley") is AIG's Senior Vice President – Financial Services and has been since June 1998. Dooley is also a member of AIG's Fund Management Team. Dooley was AIG's Vice President from 1996 to June 1998 and Treasurer from 1992 to June 1998. During the Relevant Period, AIG's investment and credit swap portfolios lost over $1.2 billion in value because of the Company's investment in mortgage backed securities. Because of his positions, defendant Dooley knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Dooley participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Dooley is a citizen of New Jersey.

19. Defendant Frederick W. Geissinger ("Geissinger") is CEO and Chairman of American General Finance and has been since September 2001. American General Finance is a wholly owned subsidiary of AIG. During the Relevant Period, AIG's investment and credit swap portfolios lost over $1.2 billion in value because of the Company's investment in mortgage backed securities. Because of his positions, defendant Geissinger knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Geissinger participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of

other statements made to the press, securities analysts and AIG shareholders. Defendant Geissinger is a citizen of Indiana.

20.    Defendant Elias F. Habayeb ("Habayeb") is CFO of AIG's Financial Services Group and has been since September 2005. During the Relevant Period, AIG's investment and credit swap portfolios lost over $1.2 billion in value because of the Company's investment in mortgage backed securities. Because of his positions, defendant Habayeb knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Habayeb participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Habayeb is a citizen of New Jersey.

21.    Defendant Robert E. Lewis ("Lewis") is AIG's Chief Risk Officer and has been since at least 2005. Lewis is also AIG's Senior Vice President and has been since May 2003. Lewis was AIG's Chief Credit Officer from 1993 to about 2005 and Vice President 1993 to May 2003. Because of his positions, defendant Lewis knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Lewis participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Lewis is a citizen of New York.

22.    Defendant Marshall A. Cohen ("Cohen") is an AIG director and has been since 1992. Cohen is a member of AIG's Compensation and Management Resources Committee and has been since at least 1994 and is Chairman of the Compensation and Management Resources Committee and has been since 2004. Because of his positions, defendant Cohen knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Cohen participated in the issuance of improper statements, including the preparation of the improper press releases and SEC

-7-

filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Cohen sold 10,093 shares of AIG stock for $711,556.50 in proceeds while in possession of material non-public information. Defendant Cohen is a citizen of Florida.

23.     Defendant Martin D. Feldstein ("Feldstein") is an AIG director and has been since 1987. Feldstein was a member of AIG's Compensation and Management Resources Committee in 2006. Because of his positions, defendant Feldstein knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Feldstein participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Feldstein is a citizen of Massachusetts.

24.     Defendant Ellen V. Futter ("Futter") is an AIG director and has been since 1999. Futter was a member of the Compensation and Management Resources Committee from 2000 to September 2002. Because of her positions, defendant Futter knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Futter participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Futter is a citizen of New York.

25.     Defendant Richard C. Holbrooke ("Holbrooke") is an AIG director and has been since 2001. Holbrooke was a member of the Compensation and Management Resources Committee from 2001 to 2005. Because of his positions, defendant Holbrooke knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Holbrooke participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Holbrooke is a citizen of New York.

-8-

26.    Defendant Frank G. Zarb ("Zarb") is an AIG director and has been since 2001. Zarb was the Interim Chairman of the Board from April 2005 to October 2006. Zarb was a member of the Audit Committee from 2001 to 2005. He currently serves as a non-voting member of all of AIG's committees. Because of his positions, defendant Zarb knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Zarb participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Zarb is a citizen of New York.

27.    Defendant Stephen L. Hammerman ("Hammerman") is an AIG director and has been since 2005. Because of his position, defendant Hammerman knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Hammerman participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Hammerman is a citizen of New York.

28.    Defendant George L. Miles, Jr. ("Miles") is an AIG director and has been since 2005. Miles is a member of the Audit Committee and has been since 2005. Because of his positions, defendant Miles knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Miles participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Miles is a citizen of Pennsylvania.

29.    Defendant Morris W. Offit ("Offit") is an AIG director and has been since 2005. Offit is a member of the Audit Committee and has been since 2005. Offit was Chairman of the Audit Committee from August 2005 to October 2006. Because of his positions, defendant Offit knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known

the adverse non-public information about the business of AIG. During the Relevant Period, Offit participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Offit is a citizen of New York.

30.    Defendant Michael H. Sutton ("Sutton") is an AIG director and has been since 2005. Sutton is Chairman of the Audit Committee and has been since November 2006 and a member of the Audit Committee and has been since October 2005. Because of his positions, defendant Sutton knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Sutton participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Sutton is a citizen of Virginia.

31.    Defendant Fred H. Langhammer ("Langhammer") is an AIG director and has been since 2006. Langhammer is a member of the Compensation and Management Resources Committee and has been since May 2006. Because of his positions, defendant Langhammer knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Langhammer participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Langhammer is a citizen of Connecticut.

32.    Defendant James F. Orr, III ("Orr") is an AIG director and has been since 2006. Orr is a member of the Compensation and Management Resources Committee and has been since 2006. Because of his positions, defendant Orr knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Orr participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of

-10-

other statements made to the press, securities analysts and AIG shareholders. Defendant Orr is a citizen of Florida.

33. Defendant Virginia M. Rometty ("Rometty") is an AIG director and has been since September 2006. Rometty is a member of AIG's Compensation and Management Resources Committee and has been since January 2007. Because of her positions, defendant Rometty knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Rometty participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Rometty is a citizen of Florida.

34. Defendant Robert B. Willumstad ("Willumstad") is AIG's Chairman of the Board and has been since November 2006 and a director and has been since January 2006. Willumstad is an *ex officio* member of all of AIG's committees and has been since November 2006. Because of his positions, defendant Willumstad knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of AIG. During the Relevant Period, Willumstad participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and AIG shareholders. Defendant Willumstad is a citizen of New York.

35. The defendants identified in ¶¶12-13, 22-34 are referred to herein as the "Director Defendants." The defendants identified in ¶¶12-21 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶14-16, 22 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

36. By reason of their positions as officers, directors and/or fiduciaries of AIG and because of their ability to control the business and corporate affairs of AIG, the Individual

-11-

Defendants owed AIG and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage AIG in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AIG and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

37.     Each director and officer of the Company owes to AIG and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of AIG, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with AIG, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of AIG.

39.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AIG, and was at all times acting within the course and scope of such agency.

40.     To discharge their duties, the officers and directors of AIG were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of AIG were required to, among other things:

        (a)     refrain from acting upon material inside corporate information to benefit themselves;

-12-

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how AIG conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

41.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AIG, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant

-13-

Period have been ratified by the remaining Individual Defendants who collectively comprised all of AIG's Board during the Relevant Period.

42.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects; (ii) enhance the Individual Defendants' executive and directorial positions at AIG and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) sell over \$6 million of their personally held shares; and (iv) deceive the investing public, including shareholders of AIG, regarding the Individual Defendants' management of AIG's operations, the Company's financial health and stability, and its future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

45.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal the true fact that AIG was misrepresenting its business prospects.

-14-

46. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of federal securities law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

47. The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

48. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND: THE SUBPRIME MORTGAGE CRISIS

49. During times relevant hereto, a crisis arose involving mortgages made to subprime borrowers. A subprime borrower is someone with a low credit score, higher debt-to-income ratio or other characteristics associated with a high probability of default relative to "prime" or less-risky borrowers.

50. In an environment of appreciating home prices and low interest rates, subprime borrowers are typically able to stay current due to the rising equity in their property. But in an environment of depreciating home prices, increasing default rates are the norm. This is exactly what has been occurring since at least June 2006.

51. Thus, a subprime mortgage crisis erupted during the late summer of 2006. During the early stages of this crisis, several prominent subprime lenders including New Century Financial Corporation ("New Century"), declared bankruptcy as liquidity dried up and lenders found

-15-

themselves unable to continue originating loans. Other subprime lenders, such as Accredited Home Lenders Holding Company ("Accredited"), staged fire sales in a desperate attempt to raise cash to stay afloat.

52.     In August 2006, the volatility in the market leading to the subprime disaster began gaining national media attention. Major Wall Street institutions, including massive hedge funds, began reporting significant losses in income on subprime mortgages as interest rates began rising. Various analysts opined that the subprime market as a whole was facing the prospect of over two million defaults on home mortgages in 2006 alone.

53.     To compound matters, personal bankruptcies began running at record highs due to rising mortgage interest rates and declining home prices. In both May and June, the Federal Reserve raised the federal funds rate a quarter of a point each month. The interest rate increases continued through September and October 2006, prompting federal banking regulators to warn housing lenders that it was their responsibility to ensure that consumers who were offered subprime mortgages would be in a position to repay them.

54.     Throughout December, national publications such as *The Wall Street Journal* reported that subprime mortgage delinquencies were mounting, and signs were spreading to other parts of the mortgage market. These articles also pointed out the extensive ramifications to mortgage-backed securities in light of the decline in housing prices and increase in mortgage defaults and foreclosures. The Mortgage Bankers Association also reported that the rate of delinquent mortgage payments had risen sharply in the period from July to September 2006, especially within the subprime sector.

55.     As interest rates and defaults increased, the subprime market fell on even harder times. An early casualty of the subprime meltdown was Sebring Capital, a Texas-based wholesale mortgage lender. It shut its doors in December 2006.

56.     Then the dominoes fell. In January 2007, Ownit Mortgage Solutions, the 16th largest subprime lender (owned in part by Merrill Lynch) announced that it had filed for bankruptcy. Mortgage Lenders Network USA, Inc. ("MLN"), the 15th largest subprime lender, announced that it would no longer make new loans the same day the Ownit bankruptcy was announced. MLN filed for

bankruptcy just three weeks later. On February 13, 2007, ResMAE Mortgage Corp., another subprime lender, filed for bankruptcy.

57.     Then, on February 7, 2007, the largest subprime lender, New Century, announced that it would restate financial results for three quarters of 2006 to correct errors regarding allowances for loan repurchase losses. The same day, British banking giant HSBC announced that it had set aside $10.5 billion dollars to cover bad loans in the United States.

58.     On February 14, 2007, the second-largest subprime lender, Accredited, announced a Q4 loss of $37.8 million, warning that bad debts had reached over 7% of its mortgage loan portfolio.

59.     The subprime mortgage mess continued to spiral downward, as the government announced a federal criminal probe against New Century in March of 2007. Within a month, New Century stopped writing mortgage loans. New Century filed for bankruptcy protection on April 2, 2007.

60.     New Century was not the only casualty. In May 2007, UBS shut down one of its hedge funds after incurring a $123 million loss due to its exposure to the United States subprime market. In June 2007, two of Bear Stears' major hedge funds collapsed due to heavy investments in securities backed by subprime mortgages.

61.     In August 2007, the second largest mortgage lender, American Home Mortgage Investment Corp. ("AHM"), filed for bankruptcy. Unlike the companies who declared bankruptcy in late 2006 and early 2007, AHM was not concentrated on the subprime sector. Countrywide Financial Corporation ("Countrywide"), the largest mortgage lender, has lost nearly all of its value and is currently being purchased by Bank of America at a deep discount. The subprime meltdown has begun to affect the mortgage market generally, as evidenced by the AHM bankruptcy and Countrywide losses.

62.     The subprime decline has also cut into other aspects of the mortgage industry. For instance, Ambac Financial Group, Inc. a mortgage insurance company, is facing large payouts for defaulted mortgages. In light of the expected payouts, Ambac has been faced with losing its AAA credit rating.

-17-

63.    AIG faces exposure to the subprime mortgage crisis on several fronts. First, AIG has approximately \$94.6 billion invested in mortgage backed securities. Second, the Company's mortgage-insurance business has written over \$25.9 billion in policies. Third, AIG has a mortgage lending segment that is facing an increasing borrower delinquency rate.

64.    In light of the extensive media attention the subprime meltdown garnered, defendants knew of, willfully ignored, were reckless in not knowing and should have known of the events transpiring in the subprime market and the extensive liability faced by the Company. Despite this exposure, the Individual Defendants caused or allowed AIG to issue the public statements described below. To make matters worse, defendants authorized a massive stock buyback in February 2007, while the subprime market was in the middle of a downward spiral fed by increasing mortgage interest rates, declining home values and escalating mortgage defaults and foreclosures.

## IMPROPER STATEMENTS

65.    The Individual Defendants by their fiduciary duties of care, good faith and loyalty owe to AIG a duty to ensure that the Company's financial reporting fairly represents the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

66.    This material, non-public information principally included AIG's exposure to the subprime mortgage crisis. Furthermore, defendants Miles, Offit and Sutton, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that the committee is responsible for reviewing and discussing earnings press releases and financial information and earnings guidance provided to analysts and rating agencies.

67.    Defendants Sullivan, Tse, Neuger, Wisner, Schreiber, Bensinger, Dooley, Geissinger, Habayeb and Lewis had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Sullivan, Tse, Cohen, Feldstein, Futter, Hammerman, Holbrooke, Langhammer, Miles,

-18-

Offit, Orr, Rometty, Sutton, Willumstad and Zarb as directors of AIG had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period, as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by AIG to the investing public and the Company's shareholders during the Relevant Period.

68.     On May 10, 2006, the Individual Defendants caused or allowed AIG to issue is first fiscal quarter 2006 earnings press release. The press release reported net income of $3.2 billion. The press release also reported $2.26 billion worth of operating income from AIG's general insurance segment and $519 million worth of operating income from AIG's financial services segment. Defendant Sullivan commented in the press release that AIG "had record General Insurance results, with strong gains in operating income and an improved combined ratio." In particular, the press release reported as follows:

American International Group, Inc. today reported that its net income for the first quarter 2006 was $3.20 billion or $1.22 per diluted share, compared to $3.80 billion or $1.45 per diluted share in the first quarter 2005. At March 31, 2006, consolidated assets were $879.80 billion and shareholders' equity was $88.39 billion.

\* \* \*

Commenting on the first quarter 2006 results, AIG President and CEO Martin J. Sullivan said, "AIG's first quarter 2006 adjusted net income was $3.38 billion or $1.29 per share, an increase of 4.6 percent from first quarter 2005. The quarter was adversely affected by one-time after tax charges of $115 million relating to expenses from the SICO compensation plans and the Starr tender offer. Results were also negatively affected by an additional allowance for losses in credit card operations in Taiwan of $88 million before tax or $57 million after tax, and an adjustment relating to deferred advertising costs in General Insurance of $59 million before tax or $38 million after tax.

"We had record General Insurance results, with strong gains in operating income and an improved combined ratio. Both Domestic and Foreign General Insurance operations had outstanding results. Life Insurance & Retirement Services had reasonably strong underlying performance, with good life insurance reserve growth and wider annuity spreads in the domestic market, while the overseas business was adversely affected by foreign exchange. In Financial Services, the negative effect of rising interest rates on the Aircraft and Consumer Finance

-19-

businesses was partially offset by improved Capital Markets transaction flow. Asset Management results reflect the runoff of the Guaranteed Investment Contract (GIC) portfolio, the delay in launching our matched investment program and the timing of real estate gains.

"A number of specific accomplishments in the first quarter deserve attention and reflect AIG's strengths and ability to extend our global franchise. The Domestic Brokerage Group continued to expand its relationships with a larger number and broader range of brokers, while also growing its presence in the small business segment. A number of other new initiatives, such as United Guaranty's international expansion and the growth of the Private Client Group, are already paying dividends. In addition, the continued strong periodic sales of universal and term life are indicative of the strength of AIG American General's independent distribution strategy. Overseas, we announced an agreement to acquire Central Insurance Co., Ltd., creating one of the largest general insurance companies in the Taiwanese market. Our life insurance operations in Japan successfully launched a series of single premium products to the newly deregulated bank channel. In April, applications were approved for provincial expansion of AIG's Chinese life insurance operations in Guangdong and Jiangsu. At the same time, provincial expansion was also granted for our general insurance operations in Guangdong. We continue to execute our growth strategies in all of our business segments, introducing new products and distribution to reach customers and build our global businesses."

## GENERAL INSURANCE

General Insurance reported first quarter 2006 operating income before realized capital gains of $2.26 billion and a combined ratio of 89.17. The relatively stable rate environment and the continuation of generally favorable policy terms and conditions contributed to the strong underwriting performance. First quarter 2006 general insurance net investment income increased 10.1 percent, benefiting from over $3 billion in positive cash flow, and higher interest rates.

General Insurance net premiums written increased 4.3 percent, or 6.0 percent in original currency, to $11.26 billion in first quarter 2006. Domestic Brokerage Group growth in net premiums written reflects a continuation of generally improving renewal retentions, higher property rates and modest rate declines in certain casualty classes. In Personal Lines, strong premium growth in the Private Client Group and Agency Auto offset the runoff of the assigned risk business and slight declines at AIG Direct and 21st Century. United Guaranty experienced strong premium growth with increases in all business lines, including new markets in Spain and Mexico. Foreign General net premiums written growth in original currency was 13.1 percent in the first quarter 2006. This includes strong growth in consumer lines, especially in accident & health, while commercial lines premium growth in Europe and excellent retention rates were partially offset by rate decreases in the United Kingdom and Australia.

At March 31, 2006, General Insurance net loss and loss adjustment reserves totaled $58.89 billion, a $1.42 billion increase from December 31, 2005. In the first

quarter of 2006, net adverse loss development from prior accident years was approximately $35 million, including approximately $98 million pertaining to prior year catastrophes.

* * *

## FINANCIAL SERVICES

First quarter 2006 Financial Services operating income before the effect of FAS 133 was $519 million compared to $562 million in first quarter 2005, a decline of 7.7 percent. With the ongoing improvement in the global commercial aviation market, especially in Asia, International Lease Finance Corporation experienced increased demand and continued improvement in lease rates. The effect of the positive lease and sales environment on operating income was offset by rising interest rates, increased credit and tax reserves and lease accruals. Capital Markets results reflect an increase in credit and equity transaction volume and continued growth in demand for products tracking the Dow Jones-AIG Commodity Index. Consumer Finance operating income declined as a result of higher borrowing costs and the previously noted increase in loan loss reserves for the credit card business in Taiwan, where the lending industry has been affected by deteriorating consumer credit conditions. This resulted in an overall increase in the loan loss allowance of $88 million, of which half is allocated to Foreign Life's operations as noted above. Favorable U.S. consumer credit conditions during first quarter 2006 contributed to American General Finance's improved net charge off and delinquency ratios.

69.     On August 9, 2006, the Individual Defendants caused or allowed AIG to issue its second fiscal quarter 2006 earnings press release. The press release reported net income of $3.19 billion. The press release also reported $2.99 billion in operating income from AIG's general insurance segment and $615 million worth of operating income from AIG's financial services segment. Defendant Sullivan commented in the press release that "AIG's strong second quarter performance reflects our ability to quickly address changes in market conditions and client demand." In particular, the press release reported as follows:

American International Group, Inc. today reported that its net income for the second quarter of 2006 was $3.19 billion or $1.21 per diluted share, compared to $4.49 billion or $1.71 per diluted share in the second quarter of 2005. Net income, as reported, includes economically effective hedging activities that currently do not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses. Second quarter 2006 adjusted net income, as defined below, was $4.16 billion or $1.58 per diluted share, compared to $3.28 billion or $1.25 per diluted share in the second quarter of 2005.

-21-

During the second quarter of 2006, AIG recorded an addition to income of $374 million, net of tax, or $0.14 per diluted share, related to the correction of the accounting for certain interests in unit investment trusts. These investments had previously been accounted for as available for sale securities, with changes in market values being reflected in other comprehensive income. The changes in market values are now included in AIG's net investment income. This adjustment had no effect on consolidated shareholders' equity at June 30, 2006 or December 31, 2005.

Net income for the first six months of 2006 was $6.39 billion or $2.43 per diluted share, compared to $8.29 billion or $3.16 per diluted share in the first six months of 2005. Adjusted net income for the first six months of 2006 was $7.53 billion or $2.87 per diluted share, compared to $6.51 billion or $2.48 per diluted share in the first six months of 2005.

\* \* \*

Commenting on the second quarter's results, AIG President and Chief Executive Officer Martin J. Sullivan said, "AIG had a very good quarter. Once again, our performance underscored the strength of AIG's widely diversified business portfolio, both domestically and overseas. General Insurance posted record underwriting profits, with a combined ratio of 86.47. Net premiums written increased across the board, and our General Insurance operations are well positioned to capitalize on opportunities in the current market environment. Life Insurance & Retirement Services had a mixed quarter, including strong production results in the domestic life insurance, payout annuities and individual variable annuities lines, with an ongoing difficult sales environment in individual fixed annuities. Our domestic life insurance operations were affected by declines in investment yield enhancements. We were also challenged by market conditions in Japan and Taiwan. We are taking appropriate action, including shifting our product mix to emphasize investment linked and personal accident & health products that provide better margins than traditional savings-oriented life products in the current low interest rate environment.

"Financial Services also reported good results. Demand for International Lease Finance Corporation's (ILFC) modern, fuel efficient fleet continues to be strong. Capital Markets experienced improved results emanating from increased transaction flow compared to last year. Consumer Finance was affected by the slowing U.S. real estate market and rising interest rates. Asset Management produced strong results, primarily driven by our Institutional Asset Management business. During the quarter, we launched our matched investment program to replace the Guaranteed Investment Contract portfolio which is now in runoff.

"AIG's strong second quarter performance reflects our ability to quickly address changes in market conditions and client demand. A number of recent accomplishments demonstrate our continued focus on geographic expansion and strategic acquisitions that will contribute to future profitable growth. For example, the expansion of our Chinese life insurance operations in Guangdong and Jiangsu provinces and the approval to conduct group insurance business throughout American International Assurance's operations in China will enable AIG to

strengthen our penetration in the retail and institutional markets in China, adding to our existing strong presence there. During the second quarter, the Canadian Parliament passed legislation that will allow United Guaranty Corporation to begin writing business in the world's second largest mortgage guaranty market, when provincial licenses are issued.

"After the quarter's close, AIG announced the acquisition of Central Insurance Co., a significant general insurance business in Taiwan. With this acquisition, AIG's companies become one of the largest general insurance businesses in that market, ranking third in gross premiums written."

## GENERAL INSURANCE

General Insurance reported second quarter 2006 operating income before realized capital gains (losses) of $2.99 billion, a 68.6 percent increase over the second quarter of 2005. Second quarter operating income increased 44.2 percent to $2.56 billion, excluding the $432 million pretax increase in income relating to the out of period adjustment from unit investment trust accounting, of which $412 million pertains to Foreign General. General Insurance achieved a combined ratio of 86.47, a 5.41 point improvement over the second quarter of 2005, primarily the result of an improved current accident year loss ratio compared to the 2005 accident year loss ratio recorded in the second quarter of 2005. The strong underwriting performance reflects continued generally favorable pricing, policy terms and conditions. Second quarter 2006 General Insurance net investment income, excluding the out of period adjustment, increased 11.5 percent, benefiting from positive cash flow and rising interest rates. Partnership income overall was good, but declined compared to very strong results in the second quarter of 2005. Foreign General net investment income, excluding the out of period adjustment, declined in the quarter compared to last year due to higher partnership realizations in the second quarter of 2005.

General Insurance net premiums written increased 9.3 percent to $11.63 billion in the second quarter. The Domestic Brokerage Group (DBG) continued to execute its core strategies of expanding distribution, product innovation and cross selling, as well as capitalizing on its extensive nationwide office network. These competitive advantages contributed to DBG's 10.8 percent growth in net premiums written in the quarter. In the United States, property rates remained strong in the second quarter with modest rate declines in certain casualty classes. Personal Lines reported an improved combined ratio and strong premium growth in the Private Client Group and Agency Auto, offset by the runoff of the assigned risk business and a slight decline in the direct auto businesses. United Guaranty had strong premium growth with increases in all business lines, and improved persistency in its domestic first lien business.

Foreign General net premiums written in original currency rose 12.4 percent in the second quarter, with strong growth in personal lines and accident & health, and very good retention rates in commercial lines. Efforts to expand the homeowners and warranty businesses contributed to personal lines growth in the quarter.

-23-

At June 30, 2006, General Insurance net loss and loss adjustment reserves totaled $60.21 billion, a $1.32 billion increase from March 31, 2006. In the second quarter of 2006, net favorable loss development from prior accident years was approximately $248 million. This includes favorable development from prior year catastrophes of approximately $53 million and excludes accretion of discount of approximately $101 million.

\* \* \*

FINANCIAL SERVICES

Second quarter 2006 Financial Services operating income before the effect of FAS 133 was $615 million, an increase of 5.7 percent compared to the second quarter of 2005. ILFC operating income in the second quarter of 2006 was approximately equal to the second quarter of 2005, as increased lease and overhaul revenues were offset by rising interest rates and charges related to bankrupt airlines. Excluding the effect of FAS 133, Capital Markets reported improved results due to increased transaction flow, especially in credit, commodity and equity products. Consumer Finance operating income declined as a result of higher borrowing costs, a cooling domestic residential real estate market, higher expenses related to overseas expansion and lower new business volumes in Taiwan in the wake of the industry wide deterioration of consumer credit conditions. In the U.S., emphasis on retail finance and branch generated products should help offset the slowdown in the domestic residential real estate market. Domestically, net charge off and delinquency ratios improved compared to the second quarter of 2005.

70.     On November 9, 2006, the Individual Defendants caused or allowed AIG to issue its third fiscal quarter 2006 earnings press release. The press release reported net income of $4.22 billion. The press release also reported $2.6 billion in operating income from AIG's general insurance segment and $574 million in operating income from AIG's financial services segment. Defendant Sullivan commented in the press release that "AIG has a diversified portfolio of market leading businesses that complement and balance each other." In particular, the press release provided as follows:

American International Group, Inc. today reported that its net income for the third quarter of 2006 was $4.22 billion or $1.61 per diluted share, compared to $1.75 billion or $0.66 per diluted share in the third quarter of 2005. Net income, as reported, includes the effect of economically effective hedging activities that currently do not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses. Third quarter 2006 adjusted net income, as defined below, was $4.02 billion or $1.53 per diluted share, compared to $1.86 billion or $0.71 per diluted share in the third quarter of 2005.

-24-

Net income for the first nine months of 2006 was $10.61 billion or $4.04 per diluted share, compared to $10.03 billion or $3.82 per diluted share in the first nine months of 2005. Adjusted net income for the first nine months of 2006 was $11.55 billion or $4.40 per diluted share, compared to $8.37 billion or $3.19 per diluted share in the first nine months of 2005.

Results for the third quarter and nine months of 2005 include $1.57 billion in catastrophe related losses, net of tax, or $0.60 per diluted share. There have been no significant catastrophes in 2006.

During the third quarter of 2006, as part of its continuing remediation efforts, AIG recorded certain out of period adjustments. These adjustments collectively increased net income by $73 million and adjusted net income by $50 million and are further detailed in the AIG Form 10-Q for the quarter ended September 30, 2006.

\* \* \*

At September 30, 2006, AIG's consolidated assets were $941.54 billion and shareholders' equity was $96.15 billion.

Commenting on the third quarter's results, AIG President and Chief Executive Officer Martin J. Sullivan said, "AIG had a very good quarter led by strong performance in our worldwide General Insurance businesses and improved results in our Life Insurance & Retirement Services operations. We continue to execute our growth strategies by capitalizing on our unique global franchise and product and distribution capabilities that distinguish AIG from our competitors.

"General Insurance posted growth in net premiums written of 8.8 percent and excellent underwriting profitability. Net premiums written for the third quarter of 2005 included a reduction of $258 million for reinstatement premiums related to catastrophes, accounting for approximately three percentage points of this increase. Across the board, our General Insurance operations are executing their growth strategies, leveraging their competitive advantages and maintaining underwriting discipline. General Insurance cash flow was strong.

"Life Insurance & Retirement Services generated good results. Domestic life insurance reported solid growth in earnings driven by increased premium revenue and improved net investment income. Payout annuities performed well in terms of premium and reserve growth during the quarter. In Domestic Retirement Services, net flows continue to be negative and reserve growth modest. Individual fixed annuities are facing a difficult sales environment, while sales of individual variable annuities remain strong. The group retirement products business has successfully implemented a number of product initiatives that have helped retain and attract rollover assets in a highly competitive environment.

"Foreign Life Insurance & Retirement Services performed very well across most product lines and regions. The introduction of investment-linked products has

been well received in a number of key markets and distribution channels. Our ongoing focus on accident & health products is increasing margins as intended. We are encouraged by the continuing progress we have made in Taiwan, as a number of the product and investment strategies initiated over the past year are showing positive results. Market conditions in Japan remain challenging due to increased competition. However, we are taking action with our product and distribution strategies in anticipation of full deregulation and are confident in our long term prospects.

"Financial Services results declined, principally due to the effect of rising interest rates on the aircraft finance and consumer finance businesses. These results exclude the effect of economically effective hedging activities that currently do not qualify for hedge accounting treatment under FAS 133. ILFC has expanded the size of its fleet over the past year and is well positioned to meet the strong demand for its aircraft in a lease rate environment that remains favorable. American General Finance continued to grow its finance receivables portfolio notwithstanding a moderating real estate market. Strong revenue growth in our Poland and Argentina consumer finance operations were offset by costs related to expansion. Capital Markets earnings declined, although AIGFP's transaction flow for credit, commodity and equity products remained robust.

"Asset Management results declined as a result of the runoff of the domestic Guaranteed Investment Contract (GIC) portfolio and lower performance fees from the Institutional Asset Management business compared to the third quarter of 2005. Growth in Institutional client assets continues to be driven by our specialty listed equity and emerging market products.

"AIG has a diversified portfolio of market leading businesses that complement and balance each other. Our geographic diversification throughout the world contributes to the strength of our business. During this quarter we continued to develop our global franchise by launching new initiatives in growing economies. For example, Foreign General set up operations in the Dubai International Financial Centre to expand its presence in the Middle East, Mediterranean and South Asia regions. As part of this effort, Foreign General also entered the Islamic Sharia-compliant insurance market with the launch of a new regional company, AIG Takaful, headquartered in Bahrain. AIG's consumer finance company in Poland, a recognized leader in that market, recently launched a credit card initiative to complement its existing personal loan products. Notably, after the quarter's close, AIG received regulatory approval from the Reserve Bank of India to operate a wholly owned Non Bank Finance Company that will serve as a platform to build an asset management and consumer finance franchise in India."

## GENERAL INSURANCE

General Insurance reported third quarter 2006 operating income before realized capital gains (losses) of $2.60 billion compared to a third quarter 2005 loss of $208 million. Third quarter 2005 results include $2.11 billion in pretax catastrophe related losses and net reinstatement premiums. There have been no significant catastrophes in 2006. The third quarter 2006 combined ratio was 89.10, a 2.34 point

improvement compared to a 91.44 third quarter 2005 combined ratio excluding catastrophe losses. In the third quarter of 2006, certain out of period adjustments related to the remediation of balance sheet account reconciliations increased net premiums earned by $99 million and increased bad debt expense by $225 million. These adjustments reflect continuing progress in AIG's ongoing remediation efforts. Third quarter 2006 General Insurance net investment income increased 38.8 percent, benefiting from strong cash flow and higher partnership income for the Domestic Brokerage Group. Included in third quarter 2006 net investment income were $213 million in out of period adjustments related to accounting for certain investments in unit investment trusts and partnerships.

Third quarter 2006 Domestic Brokerage Group net premiums written increased 10.3 percent to $6.07 billion compared to the third quarter of 2005. Net premiums written for the third quarter of 2005 were reduced by $122 million due to reinstatement premiums related to catastrophes. Net premiums written for the third quarter of 2006 were increased by $47 million due to the reversal of a reinsurance contract previously accounted for as reinsurance and now accounted for as a deposit. The overall effect of these items contributed approximately three percentage points to the year over year increase. Premium growth was driven by commercial property, primary casualty, environmental and accident & health. In Personal Lines, strong premium growth in the Private Client Group was offset by the runoff of the assigned risk business and a decline in the AIG Direct, Agency Auto and 21st Century businesses. United Guaranty had strong premium growth with increases in all business lines, primarily driven by the domestic second lien and international businesses.

Foreign General net premiums written in original currency rose 8.8 percent in the third quarter of 2006, with commercial and consumer lines growth from new business and new distribution channels. Higher premiums from the Ascot Lloyd's (Ascot) syndicate and lower reinstatement premium costs compared to the third quarter of 2005 contributed to the growth in net premiums written. The third quarter 2006 combined ratio was 83.67, with the expense ratio increasing from the prior year principally due to higher commissions related to the reinsurance and wholesale business written by Ascot and the shift in business mix to consumer lines and certain commercial lines where average acquisition costs are higher.

At September 30, 2006, General Insurance net loss and loss adjustment reserves totaled $61.51 billion, a $1.30 billion increase from June 30, 2006. This included $55 million of reserves related to the acquisition of Central Insurance Co., Ltd. in the quarter. In the third quarter of 2006, net favorable loss development from prior accident years was approximately $41 million. This includes adverse development from prior year catastrophes of approximately $43 million and excludes accretion of discount of approximately $101 million. Excluding catastrophes and the general reinsurance operations of Transatlantic, as well as accretion of discount, the overall favorable development consisted of approximately $490 million of favorable development from accident years 2003 through 2005, partially offset by

-27-

approximately $380 million of adverse development from accident years 2002 and prior.

* * *

FINANCIAL SERVICES

Third quarter 2006 Financial Services operating income before the effect of economically effective hedging activities that currently do not qualify for hedge accounting treatment under FAS 133 was $574 million, a 4.2 percent decline compared to the third quarter of 2005.

ILFC operating income in the third quarter of 2006 declined 10.3 percent to $157 million, as increases in lease and overhaul revenues were more than offset by an increase in interest expense due to rising interest rates and the inability to apply hedge accounting. Since hedge accounting under FAS 133 is not applied, the benefit of economically effective interest rate and foreign currency hedges is not reflected in ILFC's borrowing rates, and as a result, adversely affects the increase in interest expense. ILFC continues to enhance its market leadership position by maximizing lease placements in the strengthening European and Asian aviation markets. Capital Markets results declined compared to the third quarter of 2005 as the continued flat yield curve and dollar to yen exchange rate affected demand in the structured note market. However, Capital Markets transaction flow has remained strong throughout the year as its expertise in super senior credit derivatives, equity derivatives and customized commodity index products remains in demand by their global client base.

Consumer Finance operating income increased 15.8 percent to $220 million. These results were affected by $62 million in third quarter 2005 pretax catastrophe related losses in the domestic consumer finance operations. However, after a reassessment of payment and charge-off experience, American General Finance (AGF) reduced the finance receivables reserve related to Hurricane Katrina by $22 million in the third quarter 2006. While AGF experienced higher borrowing costs and a less robust real estate market compared to the prior year, third quarter 2006 receivables increased and the net charge off ratio improved compared to the third quarter of 2005. Overseas, higher revenue growth in Poland and Argentina was offset by margin compression and higher expenses related to branch and product expansions.

71. On March 1, 2007, the Individual Defendants caused or allowed AIG to issue its fiscal 2006 earnings press release. The press release reported net income of $14.05 billion for the year. The press release also reported $2.51 billion in quarterly operating income from AIG's general insurance segment and $638 million in quarterly operating income from AIG's financial services segment. Defendant Sullivan commented in the press release that AIG "also made significant progress throughout the year in improving [the Company's] financial control environment, providing

greater transparency in our financial disclosures and remaining on the forefront of good corporate governance." In particular, the press release provided as follows:

American International Group, Inc. reported net income for the full year 2006 of $14.05 billion or $5.36 per diluted share, compared to $10.48 billion or $3.99 per diluted share for the full year 2005. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses. Full year 2006 adjusted net income, as defined below, was $15.41 billion or $5.88 per diluted share, compared to $8.75 billion or $3.33 per diluted share for the full year of 2005.

Net income for the fourth quarter of 2006 was $3.44 billion or $1.31 per diluted share compared to $444 million or $0.17 per diluted share for the fourth quarter of 2005. Fourth quarter 2006 adjusted net income was $3.85 billion or $1.47 per diluted share, compared to $376 million or $0.14 per diluted share for the fourth quarter of 2005.

Fourth quarter 2006 results were negatively affected by charges for the adverse ruling in the Superior National arbitration and the exit of the domestic financial institutions credit life business, which collectively decreased net income by $124 million or $0.05 per diluted share. Fourth quarter 2006 results also included a $129 million or $0.05 per diluted share charge related to an increase in asbestos and environmental reserves resulting from the updated ground up analysis of these exposures. In addition, AIG recorded fourth quarter 2006 out of period adjustments that collectively increased net income by $56 million or $0.02 per diluted share. The out of period adjustments are further detailed in the AIG Form 10-K for the year ended December 31, 2006.

Full year and fourth quarter 2005 results included a $1.15 billion or $0.44 per diluted share after-tax charge resulting from regulatory settlements and a $1.19 billion or $0.45 per diluted share after-tax charge related to an increase of approximately $1.82 billion to AIG's net reserve for losses and loss expenses. Additionally, full year and fourth quarter 2005 results include catastrophe-related losses, net of tax of $2.11 billion or $0.80 per diluted share and $540 million or $0.20 per diluted share, respectively.

\* \* \*

At December 31, 2006, AIG's consolidated assets were $979.41 billion and shareholders' equity was $101.68 billion. Book value per share increased 17.6 percent to $39.09 from $33.24 a year ago.

Commenting on full year and fourth quarter 2006 results, AIG President and CEO Martin J. Sullivan said, "2006 was a remarkable year beginning with the resolution of our significant regulatory challenges and ending with excellent financial results. This performance reflects AIG's attractive worldwide market positions and

the growth and diversification across our major businesses. We also made significant progress throughout the year in improving our financial control environment, providing greater transparency in our financial disclosures and remaining on the forefront of good corporate governance. In addition, we advanced our economic capital modeling initiative which will help us optimize our capital management strategies. By coupling the competitive advantages of our diverse, global operations with our strategies for capital management, we expect to create additional opportunities to grow at attractive rates of return and, ultimately, drive greater shareholder returns.

"AIG reported solid increases in income in 2006. Results for the year and the fourth quarter were led by our worldwide General Insurance businesses and improved performance in Foreign Life Insurance. This overall performance reflects AIG's ability to quickly address the challenging market conditions a number of our businesses encountered throughout the year, meet the evolving needs of a diverse global client base, capitalize on new market and product opportunities and exercise the leadership for which AIG has long been known.

"In the fourth quarter, General Insurance generated strong growth in operating income, reflecting excellent underwriting results and significant returns on partnership investments. The Domestic Life Insurance businesses reported good underlying performance in the life insurance and payout annuity businesses. By exiting the domestic financial institutions credit life business, we will focus our efforts on growth opportunities in the small case employer benefits and voluntary worksite business. In Domestic Retirement Services, the fixed annuity business continues to face a difficult sales environment and surrender activity remains high. Foreign Life Insurance & Retirement Services results have been improving, as our strategy to shift the product mix to investment-linked and personal accident & health products was well executed. We still face challenging conditions in certain markets, but we have taken action and are confident in the long-term prospects of our global Life Insurance & Retirement Services franchise.

"Financial Services results were led by robust transaction flow from the Capital Markets operations. ILFC's modern, fuel-efficient fleet remains in high demand from airlines around the world. Despite the slowdown in the U.S. real estate market, credit quality in the American General Finance portfolio has held up well. Asset Management results were again adversely affected by the runoff of the Domestic Guaranteed Investment Contract portfolio. Institutional Asset Management results were affected by lower performance fees and real estate gains compared to the fourth quarter of 2005. This business, however, continues to make significant strides in attracting client assets and expanding the breadth of its product offerings."

## GENERAL INSURANCE

General Insurance reported fourth quarter 2006 operating income before realized capital gains (losses) of $2.51 billion compared to a fourth quarter 2005 loss of $1.16 billion. Fourth quarter 2005 results included $775 million in pretax current period catastrophe-related losses and net reinstatement premiums and the $1.82

billion general insurance reserve charge. There were no significant catastrophes in 2006. The fourth quarter 2006 combined ratio was 91.69, a 4.47 point improvement compared to a 96.16 fourth quarter 2005 combined ratio excluding current period catastrophe-related losses and the reserve charge. Fourth quarter 2006 General Insurance net investment income was $1.59 billion, benefiting from strong cash flow, higher interest rates and a substantial increase in partnership income compared to the fourth quarter of 2005.

Fourth quarter 2006 Domestic Brokerage Group (DBG) net premiums written declined 2.7 percent to $5.89 billion compared to the fourth quarter of 2005. Net premiums written in the fourth quarter of 2005 included approximately $300 million for the Richmond commutation from Foreign General and $147 million related to an accrual for workers' compensation premiums. The combined effect of these items reduced the fourth quarter 2006 growth rate in net premiums written by 7.7 percent. DBG experienced premium growth in many lines of business, including commercial property, primary casualty, accident & health, environmental and multinational liability, as well as in Hartford Steam Boiler's boiler and machinery coverages.

Personal Lines net premiums written increased slightly compared to the fourth quarter of 2005, as strong growth in the Private Client Group and an increase in new business policies in the direct auto business was partially offset by a decline in the Agency Auto business.

Mortgage Guaranty operating income declined primarily as a result of unfavorable loss experience on third party originated second-lien business with lower than usual credit quality combined with the effect of the softening of the U.S. housing market. The writing of this second-lien product business was discontinued as of year end 2006.

Fourth quarter 2006 Foreign General net premiums written increased 32.5 percent to $2.59 billion compared to $1.96 billion in the fourth quarter of 2005, with strong growth in personal and commercial lines driven by new business from new and existing distribution channels. Net premiums written for the fourth quarter of 2005 were reduced by approximately $300 million related to the previously mentioned Richmond commutation to DBG. This item increased the fourth quarter 2006 growth rate in net premiums written by 17.6 percent. Premium growth was driven by increases in personal property, auto and warranty lines as well as in primary casualty and financial lines.

At December 31, 2006, General Insurance net loss and loss adjustment reserves totaled $62.63 billion, a $5.15 billion increase from December 31, 2005 and a $1.12 billion increase from September 30, 2006. For the full year 2006, net loss development from prior accident years, excluding accretion of discount, was favorable by approximately $53 million. This includes a fourth quarter 2006 increase of approximately $198 million in asbestos and environmental reserves. The overall favorable development in 2006 consisted of approximately $2.30 billion of favorable development from accident years 2003 through 2005, partially offset by approximately $2.25 billion of adverse development from accident years 2002 and

prior. Fourth quarter 2006 net loss development from prior accident years, excluding accretion of discount and including the increase in asbestos and environmental reserves, was adverse by approximately $202 million. The overall adverse development in the quarter followed the accident year experience pattern of the full year.

\* \* \*

FINANCIAL SERVICES

Fourth quarter 2006 Financial Services operating income before the effect of economically effective hedge activities that did not qualify for hedge accounting treatment under FAS 133 was $638 million, an increase of 22.9 percent compared to the fourth quarter of 2005.

ILFC operating income in the fourth quarter of 2006 increased 13.9 percent, largely the result of increased lease revenues and aircraft sales, partially offset by an increase in interest expense compared to the fourth quarter of 2005. Since hedge accounting under FAS 133 was not applied, ILFC's interest expense did not reflect the benefit of hedging its interest rate and foreign currency risks on its debt.

Capital Markets operating income in the fourth quarter of 2006 increased significantly as results were, in part, driven by increased transaction flow for structured credit products, coupled with favorable demand generally across the full range of its product areas. Fourth quarter 2006 results benefited from the realization of gains on a number of transactions originated in prior years that matured or were sold in the quarter. Fourth quarter 2005 results were adversely affected by the reduction of Capital Markets' investor-based structured notes business due to AIG's inability to fully access the capital markets during 2005.

Fourth Quarter 2006 Consumer Finance operating income declined 26.4 percent to $167 million compared to the fourth quarter of 2005. American General Finance (AGF) experienced slower production in its real estate lending products and margin compression compared to the prior year, partially offset by growth in non-real estate consumer finance products. However, credit quality throughout 2006 remained stable and higher margin non-real estate and retail sales finance receivables increased compared to the fourth quarter of 2005. Higher revenues from the foreign consumer finance operations were offset by increased expenses related to product and branch expansion.

72. On May 10, 2007, the Individual Defendants caused or allowed AIG to issue its first fiscal quarter 2007 earnings press release. The press release reported net income of $4.13 billion. The press release also reported $2.98 billion in operating income for its general insurance segment and $444 million in operating income from its financial services segment. Defendant Sullivan admitted in the press release that "United Guaranty's results were adversely affected by the continued

-32-

slowdown in the U.S. residential real estate market." Sullivan also disclosed a $128 million charge in connection with Company discussions with the Office of Thrift Supervision regarding loans originated by AIG Federal Savings Bank. Nevertheless, Sullivan continued to claim that AIG's businesses were continuing to "execute on their growth strategies ...." In particular, the press release provided as follows:

American International Group, Inc. today reported that its net income for the first quarter of 2007 was $4.13 billion or $1.58 per diluted share, compared to $3.20 billion or $1.22 per diluted share in the first quarter of 2006. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133 or for which hedge accounting was not applied, including the related foreign exchange gains and losses. First quarter 2007 adjusted net income, as defined below, was $4.39 billion or $1.68 per diluted share, compared to $3.38 billion or $1.29 per diluted share for the first quarter of 2006.

* * *

At March 31, 2007, AIG's consolidated assets were $999.75 billion and shareholders' equity was $103.06 billion. Book value per share increased to $39.64 compared to $39.09 at year end 2006.

During the first quarter of 2007, AIG repurchased 2,470,499 shares of its common stock. An additional 6,643,052 shares were purchased during April 2007.

Commenting on first quarter 2007 results, AIG President and CEO Martin J. Sullivan said, "AIG had a very good quarter, with strong performance in our worldwide General Insurance businesses, continued improvement in Foreign Life Insurance, and solid results at ILFC and Asset Management.

"In General Insurance, the Domestic Brokerage Group and Foreign General reported strong growth in operating income on excellent underwriting results and increased net investment income. United Guaranty's results were adversely affected by the continued slowdown in the U.S. residential real estate market. Domestic Personal Lines reflects strong underwriting results in the direct auto business and continued profitable growth from the Private Client Group.

"Domestic Life Insurance results were driven by in-force growth and increased net investment income in the life insurance and payout annuity businesses, while Domestic Retirement Services experienced a decline in deposits and increased surrender activity. In Foreign Life Insurance & Retirement Services, most product lines and regions performed well.

-33-

"In Financial Services, aircraft lease rates remained strong as did demand for ILFC's modern fuel-efficient fleet. AIG Financial Products experienced slower transaction flow compared to a strong first quarter of 2006. While the slowdown in the U.S. residential real estate market affected American General Finance's results, prior action taken to limit certain geographic and product exposures has helped AGF avoid some of the significant credit deterioration currently facing the real estate lending industry. First quarter 2007 consumer finance operating income was adversely affected by a $128 million pre-tax charge relating to ongoing discussions with the Office of Thrift Supervision relating to loans originated in the name of AIG Federal Savings Bank.

"Asset Management results increased compared to the first quarter of 2006, due primarily to growth in Guaranteed Investment Contracts which benefited from higher partnership income, which will vary from period to period. Growth in Institutional Asset Management revenues and operating income was driven by contributions from all asset classes globally.

"As our businesses execute on their growth strategies, we continue to seek opportunities to extend our global footprint, laying the groundwork for the future. For example, in March, AIG Global Investment Group received approval to set up a representative office in Tianjin, the third largest city in China in per capita GDP. AIG Consumer Finance Group added to its existing retail bank and credit card operations in Thailand by acquiring a majority interest in a secured lending company with a network of 138 branches. We have also taken initial steps to build an asset management and consumer finance franchise in India by acquiring a sales finance lending operation, establishing a real estate investment joint venture and launching our first equity fund. We believe these businesses complement our existing operations in these markets and offer future growth potential."

## GENERAL INSURANCE

General Insurance first quarter 2007 operating income before realized capital gains (losses) increased 31.5 percent to $2.98 billion compared to the first quarter of 2006. The first quarter 2007 combined ratio was 87.52, a 1.65 point improvement compared to the first quarter of 2006, including a 2.46 point improvement in the loss ratio. First quarter 2007 General Insurance net investment income increased 39.8 percent to $1.56 billion, on higher levels of invested assets and increased partnership income compared to the first quarter of 2006.

Domestic Brokerage Group (DBG) net premiums written increased 2.5 percent to $6.01 billion compared to the first quarter of 2006, with DBG's diverse product offerings including energy, environmental, multinational liability and accident & health products, contributing to the quarter's growth. Strong growth in the accident & health lines was enhanced by the acquisition of TravelGuard International in the second quarter of 2006. The growth in net premiums written was partially offset by declines in certain parts of the excess casualty and directors & officers product lines, reflecting softening market conditions for those products.

-34-

Personal Lines net premiums written increased 2.6 percent compared to the first quarter of 2006, resulting from continued growth in the Private Client Group and increases in the direct auto business driven by strong new business production, particularly from Internet activity.

Mortgage Guaranty operating income declined primarily due to the continued softening of the U.S. housing market, resulting in unfavorable loss experience on domestic first and second-lien business, including continuing adverse performance of the third-party originated second-lien product. Net premiums written increased on strong growth in European markets and higher renewal premiums on the domestic second-lien book of business.

Foreign General net premiums written increased 12.6 percent in original currency compared to the first quarter of 2006, with growth in both commercial and consumer lines driven by new business from both established and new distribution channels. Higher commercial lines retention rates and growth in financial lines and primary casualty, particularly in Europe, contributed to the increase.

At March 31, 2007, General Insurance net loss and loss adjustment reserves totaled $64.03 billion, a $1.40 billion increase from December 31, 2006. For the first quarter of 2007, net loss development from prior accident years, excluding accretion of discount, was favorable by approximately $131 million. The overall favorable development consisted of approximately $265 million of favorable development from accident years 2003 through 2006, partially offset by approximately $134 million of adverse development from accident years 2002 and prior.

\* \* \*

FINANCIAL SERVICES

First quarter 2007 Financial Services operating income before realized capital gains (losses) and the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133 or for which hedge accounting was not applied, was $444 million, a decline of 14.3 percent compared to the first quarter of 2006. In the first quarter of 2007, AIG began applying hedge accounting for certain transactions, primarily in its Capital Markets operations.

Aircraft Leasing operating income in the first quarter of 2007 increased 49.6 percent, as strong lease rates, increased utilization and growth in the ILFC lease portfolio offset the increase in interest expense compared to the first quarter of 2006. First quarter 2006 ILFC operating income included $37 million in charges relating to increased tax and credit reserves and overhaul accruals. Transaction volume at AIG Financial Products in equity, commodity and interest rate products slowed in the first quarter of 2007 compared to a stronger first quarter of 2006, which benefited from a number of sizable realizations. In a transaction-oriented business like Capital Markets, such variability in results is not unusual.

First quarter 2007 Consumer Finance operating income declined 57.7 percent to $74 million compared to the first quarter of 2006. First quarter 2006 results included an $88 million increase in loan loss reserve for the Taiwan credit card business, half of which was allocated to Foreign life insurance.

In light of evolving market and regulatory developments affecting non-prime mortgage lending, AIG's domestic consumer finance operations are in ongoing discussions with the Office of Thrift Supervision relating to loans originated in the name of AIG Federal Savings Bank during the period from July 2003 to May 2006. Management expects that the application of underwriting criteria developed in consideration of regulatory guidance issued by the banking agencies will result in significant costs to the domestic consumer finance operations. At this time, management's best estimate of these costs is $128 million pre-tax, and a charge for this amount has been included in consumer finance operating income for the three months ended March 31, 2007.

AGF operating income was also affected by lower real estate production volumes and margin compression compared to the prior year. While delinquency ratios increased compared to the prior year, they remained at historically low levels. These results were partially offset by growth in non-real estate and retail sales receivables. Higher revenues from the foreign consumer finance operations, primarily in Poland and Argentina, were offset by increased expenses related to product and branch expansion.

73.    On May 11, 2007, AIG hosted an earnings conference call. During the call, defendant

Neuger stated that he saw the weakening subprime market as creating "a lot of opportunity" for AIG.

Neuger continued as follows:

We have been *disciplined* in credit quality .... What is happening is players are leaving the market or abandoning the business. Some of them have gone bankrupt as I am sure you know. And some of the exotic products that have been offered, particularly the negative am loans, which we never did offer, are I think going to be a very, very reduced part of the marketplace. That means that there is going to be much more of a level playing field from our perspective. Therefore, I think there is a lot of opportunity for us in the next 18 to 24 months.

74.    During the call, in regard to the $128 million charge, defendant Dooley commented

that the charge is "not only an AIG issue, but it is a market issue." Dooley commented further that "[t]he federal banking regulations are seeking to have lenders assist certain non-prime borrowers to remain in their homes, and these discussions have centered around that...." In regard to the charge, defendant Sullivan commented that "[w]e expect that the application of underwriting criteria developed in consideration of regulatory guidance issued by the banking agencies will result in

-36-

significant cost .... our ***best estimate*** of these costs is $128 million ...."

75.    On August 8, 2007, the Individual Defendants caused or allowed AIG to issue its second fiscal quarter 2007 earnings press release. The press release reported net income of $4.28 billion. The press release also reported $3.04 billion in operating income for AIG's general insurance segment and $512 million in operating income for AIG's financial services segment. Defendant Sullivan commented that "We continue to be ***very comfortable*** with our exposure to the U.S. residential mortgage market, both in our operations and our investment activities." In particular, the press release provided as follows:

American International Group, Inc. (AIG) today reported that its net income for the second quarter of 2007 was $4.28 billion or $1.64 per diluted share, compared to $3.19 billion or $1.21 per diluted share in the second quarter of 2006. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses.

Second quarter 2007 adjusted net income, as defined below, was a record $4.63 billion or $1.77 per diluted share, compared to $4.16 billion or $1.58 per diluted share in the second quarter of 2006.

Net income for the first six months of 2007 was $8.41 billion or $3.21 per diluted share, compared to $6.39 billion or $2.43 per diluted share in the first six months of 2006. Adjusted net income for the first six months of 2007 was $9.02 billion or $3.44 per diluted share, compared to $7.53 billion or $2.87 per diluted share in the first six months of 2006.

\* \* \*

(a) Represents the effect of hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses. In the first quarter of 2007, AIG began applying hedge accounting for certain transactions, primarily in its Capital Markets operations. In the second quarter of 2007, AGF and ILFC began applying hedge accounting to most of their derivatives hedging interest rate and foreign exchange risks associated with their floating rate and foreign currency denominated borrowings. The three and six months ended June 30, 2007 include out of period after-tax charges of $280 million and $247 million, respectively, including a $247 million after-tax charge in both periods to reverse net gains recognized on transfers of available for sale securities among legal entities consolidated within AIGFP. The first six months of 2006 included an out of period charge of $145 million, net of tax, related to the remediation of the material weakness in accounting for certain derivative transactions under FAS 133.

-37-

(b) Excludes net realized capital gains (losses), cumulative effect of an accounting change and FAS 133, net of tax.

(c) Includes out of period increases of $123 million or $0.05 per diluted share and $311 million or $0.12 per diluted share in the second quarter of 2007 and 2006, respectively. See note (g) on page 11.

(d) Represents the cumulative effect of an accounting change, net of tax, related to FAS 123R "Share-Based Payment".

(e) Includes out of period increases (decreases) of $(170) million or $(0.07) per diluted share and $25 million or $0.01 per diluted share in the first six months of 2007 and 2006, respectively. See note (g) on page 11.

At June 30, 2007, AIG's consolidated assets were $1.034 trillion and shareholders' equity was $104.33 billion. Book value per share increased to $40.44, including a reduction of $0.90 per share related to payments advanced to repurchase shares of $2.34 billion.

During the second quarter of 2007, AIG repurchased 22,021,462 shares of its common stock. An additional 24,501,510 shares were purchased through August 6, 2007, for a total of 48,993,471 shares purchased year to date.

Commenting on the second quarter's results, AIG President and Chief Executive Officer Martin J. Sullivan said, "Overall, AIG performed very well in the second quarter. Results were driven by solid growth in General Insurance, Life Insurance & Retirement Services, Asset Management and Capital Markets. Partnership returns remained strong, positively affecting investment income.

"AIG's financial performance continues to reflect the competitive advantages of our diverse, global operations. With well positioned, market leading businesses and a balance sheet that now exceeds a trillion dollars in assets, we continue to successfully translate these strong attributes into specific strategies and positive business results. Management remains focused on expanding AIG's global reach, recently receiving approval to establish a wholly owned general insurance subsidiary in China, acquiring a mortgage finance company in India, and expanding our business cooperation agreement with the Bank of Investment and Development of Vietnam.

"Within the organization, we are also taking steps that will enhance future performance. The continuing development of our economic capital model is helping us deploy capital more efficiently. Our Deliver the Firm initiative to leverage AIG's scale and scope is being embraced within the organization as a powerful means to generate new business. For instance, AIG Private Client Group and AIG Advisor Group recently formed a strategic alliance to enhance AIG's ability to serve the high-net-worth market by offering creative insurance solutions in addition to the broad range of investment options currently available. Additionally, worldwide recognition of our brand is increasing quickly through AIG's corporate advertising and brand-

building sponsorships, including our sponsorship of Manchester United Football Club. In fact, AIG recently made its first appearance on BusinessWeek's annual 'Top 100 Brands' survey. AIG ranked 47th on the list of the most valuable global brands, ahead of all insurance competitors, with a brand value estimated at $7.49 billion.

"During the second quarter of 2007, AIG increased book value and generated an adjusted return on equity of 19.8 percent, while returning capital to shareholders through share repurchases and increased dividends. We remain focused on creating long-term opportunities to grow at attractive rates of return and, ultimately, driving even greater shareholder value.

"We continue to be very comfortable with our exposure to the U.S. residential mortgage market, both in our operations and our investment activities. However, in recognition of the significant investor interest in this topic, we will provide a presentation during our earnings call, which will be available in the investor information section of AIG's website tomorrow morning at 7:30 a.m."

## GENERAL INSURANCE

General Insurance second quarter 2007 operating income before net realized capital gains (losses) increased 1.7 percent to $3.04 billion compared to the second quarter of 2006, or 18.9 percent excluding the $432 million second quarter 2006 pre-tax increase in income relating to the out of period adjustment from unit investment trust accounting. The second quarter 2007 combined ratio was 87.12, compared to 86.47 in the second quarter of 2006. Second quarter 2007 General Insurance net investment income reflects higher levels of invested assets and increased partnership income compared to the second quarter of 2006.

Domestic Brokerage Group (DBG) second quarter 2007 operating income was $1.98 billion, an increase of 30.4 percent compared to the second quarter of 2006 on strong growth in underwriting profit and net investment income. Improved underwriting results reflect favorable loss trends in recent accident years across most lines of business. Second quarter 2007 net premiums written declined slightly to $6.44 billion compared to $6.48 billion in the second quarter of 2006, as DBG maintained its underwriting discipline. Strong growth in the commercial property, commercial liability, and accident & health lines was offset by increasing competition and rate declines in directors & officers, excess casualty and workers' compensation coverages.

Personal Lines second quarter 2007 operating income was $120 million compared to $117 million in the second quarter of 2006. Net premiums written increased 1.9 percent compared to the second quarter of 2006, driven by continued growth in the AIG Private Client Group. The second quarter 2007 combined ratio improved to 94.50, primarily due to pricing and underwriting enhancements in AIG Agency Auto, favorable loss trends and growth in the Private Client Group and solid underwriting results in the direct business.

Mortgage Guaranty reported an operating loss of $78 million in the second quarter of 2007, compared to income of $110 million in the second quarter of 2006. The continuing weakness in the U.S. housing market resulted in a significant increase in losses for the domestic mortgage insurance business. The domestic second-lien business was the primary contributor to the decline in operating income; however, the domestic first-lien business also experienced an increase in incidence and severity of losses incurred. Net premiums written increased 40.9 percent on strong growth in international markets and higher renewal premiums on the domestic first-lien book of business, where persistency has increased compared to the second quarter of 2006.

Foreign General second quarter 2007 operating income declined 22.7 percent to $849 million compared to the second quarter of 2006, but increased 23.8 percent excluding the $412 million second quarter 2006 out of period adjustment for unit investment trusts. Second quarter 2007 operating income was negatively affected by $68 million in catastrophe-related losses from the U.K. floods. Net premiums written increased 9.4 percent in original currency compared to the second quarter of 2006, with consumer lines in Latin America, Europe and the Far East as well as commercial lines in Europe and the U.K. contributing to the increase.

At June 30, 2007, General Insurance net loss and loss adjustment reserves totaled $65.20 billion, a $1.16 billion increase from March 31, 2007. For the second quarter of 2007, net loss development from prior accident years, excluding accretion of discount, was favorable by approximately $120 million. The overall favorable development consisted of approximately $475 million of favorable development from accident years 2003 through 2006, partially offset by approximately $355 million of adverse development from accident years 2002 and prior.

*  *  *

FINANCIAL SERVICES

Second quarter 2007 Financial Services operating income, before net realized capital gains (losses) and the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, was $512 million, a decline of 16.5 percent compared to the second quarter of 2006.

Aircraft Leasing operating income was $190 million in the second quarter of 2007, compared to $189 million in the second quarter of 2006. Strong lease rates and continued growth in the ILFC lease portfolio were partially offset by the increase in interest expense and lower flight equipment remarketing compared to the second quarter of 2006.

Capital Markets operating income increased 29.4 percent as AIG Financial Products Corp. experienced increased transaction flow in its equity, credit and currency products compared to the second quarter of 2006.

Second quarter 2007 Consumer Finance operating income was $58 million compared to $199 million in the second quarter of 2006. Second quarter 2007 results

-40-

include the previously announced $50 million charge related to the estimated cost of implementing the financial remediation plan, pursuant to the terms of the Supervisory Agreement reached by AIG's domestic consumer finance operations with the Office of Thrift Supervision. This is in addition to the $128 million charge in the first quarter of 2007. American General Finance, Inc. operating income was also adversely affected by lower real estate production volumes and margin compression compared to the prior year. While charge-off and delinquency ratios increased primarily due to maturing of the portfolio, they remain stable and near historic lows.

Overseas, loan growth in Poland and Argentina fueled strong revenue increases, partially offset by sluggish results in Asia and higher expansion related expenses.

76.     On August 9, 2007, AIG hosted an earnings conference call to discuss its second quarter earnings and to clarify the Company's exposure to the subprime mortgage crisis. During the call, defendant Sullivan reiterated his claim that the subprime market crisis was an "opportunity" for the Company "despite the short-term pressures." Sullivan commented further:

Exposures to the residential mortgage-backed securities market within AIG's insurance investment portfolios are of a high quality and enjoy *substantial protection* through collateral subordination. AIG does not need to trade mortgage-related securities and does not depend on them for its liquidity needs.

Temporary market disruptions may have some noneconomic effect on AIG through unrealized losses. However, the sound credit quality of the portfolios should result in collection of substantially all principal and interest under any reasonable scenario.

AIG's Financial Products portfolio of super senior credit default swaps is *well structured*; undergoes ongoing monitoring, modeling, and analysis; and enjoys significant protection from collateral subordination. Certainly, we will be following this market closely during this period of volatility and correction, and we will continue to *manage these risks carefully*.

77.     During the call, defendant Lewis commented that declines in the mortgage market would have to reach "*Depression proportions*" before it negatively impacted AIG's portfolio. In particular, defendant Lewis stated the following:

AIG views such declines as temporary, as the robust cash flow characteristics combined with the reasonably short maturity structure of most of these securities will exert a very strong pull to par even if markets remain unstable. AIG views recent pricing as indicative of market turmoil *unrelated to the fundamental financial characteristics* of these securities.

-41-

In addition, we believe that it would take declines in housing values to reach Depression proportions, along with *default frequencies never experienced*, before our AAA and AA investments would be impaired.

AIG does not need to liquidate any investment securities in a chaotic market due to its strong liquidity and cash flow as well as its superior financial strength. I am confident in our people and our risk management processes. Our exposures to this market are *prudent*, given the nature of our business and our financial strength. AIG has the financial wherewithal and expertise to take advantage of opportunities as they arise in the future.

In all the areas where we are active, we have strong risk management processes undertaken by experienced professionals. The risks we take are analyzed based upon our own independent analyses, modeling, and monitoring. Risk tolerances and appetites are formulated and implemented within authorities allocated by senior management; and ongoing review and analysis is undertaken both in the businesses as well as at the corporate enterprise risk management level.

Although the market may continue to experience a period of adjustment and volatility, our exposures are understood and well managed within an appropriate risk tolerance for a strong world leader in Insurance and Financial Services.

78. On August 13, 2007, the *Associated Press* published an article titled "AIG Sees Small Subprime Risk." The article quoted Janet Tavakoli, president of a Chicago research firm, who criticized AIG's valuation models for its derivative insurance contracts written against financial instruments that included subprime debt. In particular she stated: "There's no way these aren't showing a loss ...." Defendant Habayeb, who was also quoted in the article, countered by stating: "I believe we come up with our *best estimate* of the fair value (of these instruments) based on all information available to us and that's reflected in our financial statements."

## THE TRUTH IS REVEALED

79. Then, on November 7, 2007, AIG issued a press release for its third fiscal quarter 2007 that revealed the true extent of the Company's exposure to the subprime mortgage market crisis. The press release reported that AIG's net income for the quarter was $3.09 billion—27% less than what the Company earned during the same quarter in the prior year. These disappointing earnings were driven by approximately *$1.4 billion* in losses in AIG's investment portfolio, credit-swap portfolio and mortgage insurance business. The investment portfolio lost $864 million; the credit-swap portfolio lost $352 million; and AIG's mortgage-insurance business lost $215 million. The

-42-

third quarter earnings press release provided as follows:

> American International Group, Inc. today reported that its net income for the third quarter of 2007 was $3.09 billion or $1.19 per diluted share, compared to $4.22 billion or $1.61 per diluted share in the third quarter of 2006. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses.
>
> Third quarter 2007 adjusted net income, as defined below, was $3.49 billion or $1.35 per diluted share, compared to $4.02 billion or $1.53 per diluted share in the third quarter of 2006.
>
> Included in both third quarter and nine months 2007 net income and adjusted net income was a charge of approximately $352 million pretax ($229 million after tax) for a net unrealized market valuation loss related to AIG Financial Product Corp.'s (AIGFP) super senior credit default swap portfolio. AIG continues to believe that it is highly unlikely that AIGFP will be required to make payments with respect to these derivatives.
>
> Net income for the first nine months of 2007 was $11.49 billion or $4.40 per diluted share, compared to $10.61 billion or $4.04 per diluted share in the first nine months of 2006. Adjusted net income for the first nine months of 2007 was $12.51 billion or $4.79 per diluted share, compared to $11.55 billion or $4.40 per diluted share in the first nine months of 2006.
>
> * * *
>
> At September 30, 2007, AIG's consolidated assets were $1.072 trillion and shareholders' equity was $104.07 billion. Shareholders' equity declined slightly compared to June 30, 2007, primarily as a result of net income offset by share repurchase activity and $2.45 billion after tax in unrealized depreciation of investments reported in Other Comprehensive Income.
>
> Book value per share increased to $40.81, including a reduction of $0.50 per share related to payments of $1.27 billion advanced to repurchase shares.
>
> During the third quarter of 2007, AIG repurchased 30,611,884 shares of its common stock. An additional 13,964,098 shares were purchased through November 5, 2007, for a total of 69,067,943 shares purchased year to date.
>
> Commenting on the third quarter's results, AIG President and Chief Executive Officer Martin J. Sullivan said, "In a volatile market environment that challenged many financial institutions, AIG reported adjusted net income of $3.49 billion in the third quarter of 2007 and increased book value per share to $40.81, once again confirming the benefits of our diversified portfolio of global businesses. While U.S. residential mortgage and credit market conditions adversely affected our results, our

active and strong risk management processes helped contain the exposure. Our balance sheet remains strong with the financial resources to weather continued uncertainty as well as to take advantage of attractive market opportunities as they emerge.

"Domestic Brokerage Group, Aircraft Leasing and Asset Management reported strong operating income growth. Life Insurance & Retirement Services operating income declined as market volatility adversely affected investment returns of certain asset classes and our businesses in the Japan and U.S. markets faced challenging market conditions. However, we experienced strong life insurance production in Asia, improved universal life and variable universal life sales in the Domestic Life operations and improved deposits for group retirement products and individual variable annuities in Domestic Retirement Services.

"Our Mortgage Guaranty business reported an operating loss in the quarter resulting from the continued deterioration in the U.S. housing market. American General Finance's adherence to disciplined underwriting standards has helped maintain the credit quality of its real estate portfolio. AIGFP reported an operating loss in the quarter due principally to the unrealized market valuation loss related to its super senior credit default swap portfolio. Although GAAP requires that AIG recognize changes in valuation for these derivatives, AIG continues to believe that it is highly unlikely that AIGFP will be required to make any payments with respect to these derivatives.

"During the quarter we recorded pretax net realized capital losses of $864 million on a total cash and invested asset portfolio of $872.3 billion. Within the net realized capital losses are $529 million of charges for other-than-temporary declines in value, including impairments of approximately $149 million related to AIG's residential mortgage-backed securities portfolio. Despite the volatility of the recent quarter, AIG's exposure to the residential mortgage-backed securities market within the investment portfolios remains high quality and with substantial protection through collateral subordination.

"Overall, our diverse global businesses are well positioned to respond to both challenges and opportunities. We continue to manage risks carefully and remain confident in our long term strategies to build shareholder value."

GENERAL INSURANCE

General Insurance third quarter 2007 operating income before net realized capital gains (losses) declined 3.4 percent to $2.51 billion compared to the third quarter of 2006. Improved underwriting results in the Domestic Brokerage Group were offset by a $215 million operating loss in the Mortgage Guaranty business and declines in operating income in the Personal Lines and Foreign General businesses. The third quarter 2007 combined ratio was 90.17, compared to 89.10 in the third quarter of 2006. Third quarter 2007 General Insurance net investment income increased 1.8 percent compared to the third quarter of 2006, which included $213

million of income for an out of period adjustment for unit investment trusts and partnership income.

Domestic Brokerage Group (DBG) third quarter 2007 operating income was $1.89 billion, an increase of 24.5 percent compared to the third quarter of 2006. Improved underwriting results reflect favorable loss trends in recent accident years across most lines of business. Third quarter 2007 net premiums written declined slightly to $6.01 billion compared to $6.07 billion in the third quarter of 2006 as DBG maintained underwriting discipline in a competitive market. Premium growth in risk management, accident & health and program business offset the effects of increasing competition and rate declines in property and most casualty lines.

Personal Lines third quarter 2007 operating income was $28 million compared to $133 million in the third quarter of 2006. The decline in operating income was due primarily to unfavorable loss reserve development in prior accident years from discontinued businesses, together with transaction and integration costs related to the acquisition of the minority interest in 21st Century Insurance Group. Net premiums written increased 7.8 percent compared to the third quarter of 2006, the result of continued growth in the AIG Private Client Group and stronger growth in Agency Auto and aigdirect.com, our newly combined direct auto business.

United Guaranty Corporation reported an operating loss of $215 million in the third quarter of 2007, compared to income of $85 million in the third quarter of 2006, due to unfavorable loss experience as a result of the continued deterioration of the U.S. housing market. Third quarter 2007 net premiums written increased 30.6 percent compared to the third quarter of 2006, reflecting higher international premiums from strong growth in Europe, Canada and Australia.

Foreign General third quarter 2007 operating income declined 12.4 percent to $631 million compared to the third quarter of 2006, largely due to lower favorable loss development in prior accident years, additional losses from the June 2007 U.K. floods and an increase in severe but non-catastrophic losses. Net premiums written increased 11.0 percent in original currency compared to the third quarter of 2006, with consumer lines in Latin America, Asia and Europe, as well as commercial lines in Europe and the U.K., contributing to the increase.

At September 30, 2007, General Insurance net loss and loss adjustment reserves totaled $66.94 billion, a $1.74 billion increase from June 30, 2007. For the third quarter of 2007, net loss development from prior accident years, excluding accretion of discount, was favorable by approximately $337 million. The overall favorable development consisted of approximately $764 million of favorable development from accident years 2004 through 2006, partially offset by adverse development from earlier prior accident years.

\* \* \*

FINANCIAL SERVICES

Third quarter 2007 Financial Services operating income, before net realized capital gains (losses) and the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, was $307 million, a decline of 46.3 percent compared to the third quarter of 2006.

Aircraft Leasing operating income was $269 million in the third quarter of 2007, compared to $157 million in the third quarter of 2006. Results were driven by ILFC's larger aircraft fleet, higher lease rates, higher utilization and income from the sale of aircraft assets.

Capital Markets reported a $58 million operating loss in the third quarter of 2007, primarily due to a $352 million unrealized market valuation loss related to the AIGFP's super senior credit default swap portfolio and a $51 million out of period charge related to a series of lease transactions. These items offset good transaction flow in AIGFP's credit, interest rate, commodity and currency products and a $131 million unrealized market valuation gain on the value of certain credit derivatives.

AIG estimates a further unrealized market valuation loss through October 2007 of approximately $550 million before tax for AIGFP's super senior credit default swap portfolio.

Third quarter 2007 Consumer Finance operating income was $80 million compared to $220 million in the third quarter of 2006. American General Finance, Inc. operating income declined due to reduced origination volume and higher warranty reserves in its mortgage banking operation as well as an increase in allowance for loan losses. AGF's adherence to disciplined underwriting standards has helped maintain the credit quality of its real estate portfolio. Over the past quarter, the portfolio experienced modest deterioration driven to a large extent by the maturation of the assets and current market conditions. Loan growth in Poland, Thailand and Argentina was the primary driver of AIG Consumer Finance Group's increased revenue compared to the third quarter of 2006. Operating income declined due to higher expenses associated with branch expansions, acquisition activities and product promotion campaigns.

80.     Even after the above disclosure, at an AIG investor meeting on Wednesday, December 5, 2007, Sullivan stated that AIG's credit portfolio was so sound that the chance of the Company's financial products unit sustaining economic losses was "close to zero" and that AIG was "confident in our marks and the reasonableness of our valuation methods." Sullivan added, "We cannot predict the future, but we have ... a high degree of certainty in what we have booked to date." Further, Sullivan stated, U.S. residential housing exposures "are manageable given [AIG's] size, financial strength and global diversification" and that the Company "we have the ability to hold devalued investments to recovery."

-46-

81. At the investor meeting, Sullivan provided a positive growth outlook and said the five-year adjusted earnings per share growth target is between 10% and 12%, while return on equity is targeted at a range of 15% to 16% for the same five-year period. According to AIG, the Company's investments have little or no exposure to asset-backed commercial paper, structural investment vehicles or RMBS – based collateralized debt obligations. Sullivan stated that what's key is that "AIG does not rely on asset-backed commercial paper or the securitization markets responding and importantly, we have the ability to hold devalued investments to recovery. That's very important."

82. Prior to Sullivan's comments, AIG's stock had fallen approximately 23% in the previous six months upon concern over struggling credit markets hurting AIG's performance. However, after Sullivan's positive comments and projections at the investor meeting soothing nervous investors, AIG's shares jumped $2.70 and approximately 5.0% to close at $58.15 on Wednesday, December 5, 2007. At the time, AIG admitted that it could face a total write down of about $1 billion for unrealized losses in its credit swap portfolio for October and November 2007.

83. On Monday, February 11, 2008, AIG's stock fell the most in twenty years in New York trading after its independent auditor, PricewaterhouseCoopers LLC ("PWC") found faulty accounting may have understated the Company's losses on some holdings. In the Company's 8-K filing, it disclosed that it would need to alter the way it valued credit-default swaps involving CDOs as AIG issued credit-default swaps, which protect fixed income investors against losses, declined by $4.88 billion in value in October and November 2007 and lost a total of approximately $6 billion in value, which was significantly greater than the previously disclosed $1 billion figure. The disclosure cast doubt on AIG's past statements that the Company did not face any significant problems stemming from the ongoing credit crisis and also raised concerns that AIG will report further losses.

84. PWC said that AIG's internal valuation methods, which the Company's executives exhaustively outlined for investors for purposes of supporting their claims of financial soundness, were seriously flawed. As a result of these disclosures which drastically differed from the statements and disclosures of AIG's executives in August and December 2007, AIG's shares hit a new 52-week

-47-

low and plunged $5.94 or 11.7% to close at $44.74, their lowest level in five years. Furthermore,

Fitch Ratings announced that it may lower AIG's AA credit rating because of AIG's "weakness in

internal controls" coupled with "current market conditions, contributing to uncertainty regarding the

valuation" of the Company's derivative portfolio.

85. The next day, *The Wall Street Journal* reported:

The finding by AIG's auditors PricewaterhouseCoopers LLP forced the big insurer to lower the value of insurance contracts it holds by an estimated $4.88 billion, before tax. Late last year, AIG went to great lengths to tell investors about the Company's exposure to subprime mortgages and estimated its losses on those instruments would be much smaller just above $1 billion for October and November.

\* \* \*

Investors sold AIG's shares aggressively, sending them down $5.94, or 12%, to $44.74, a five-year low, and below its nadir during its accounting scandal. The decline wiped out $15 billion in stock market value and was the biggest percentage drop for AIG's shares since the 1987 stock-market crash. AIG's shares have lost a third of their value in the past year and are down 23% this year. Bond-rating firm Fitch Ratings announced yesterday that it is putting AIG's issuer default rating on "negative" watch.

The article continued:

For AIG, having an auditor say it had weak internal controls was a serious blow. The company had long been considered too complex and opaque for investors to thoroughly analyze. To own the stock, investors essentially had to take the company at its word that its accounting systems were solid. Other big financial companies such as Freddie Mac and Fannie Mae haven't recovered from the exposure of their accounting systems as flawed.

## REASONS THE STATEMENTS WERE IMPROPER

86. AIG's Relevant Period statements failed to disclose and misrepresented the following

material adverse facts, which the Individual Defendants knew, consciously disregarded, were

reckless and grossly negligent in not knowing or should have known:

(a) AIG's portfolios were more exposed to the subprime mortgage crisis than

what the Company had disclosed;

(b) AIG's mortgage insurance business was experiencing losses as a result of the

subprime mortgage crisis; and

-48-

(c)     as a result of the foregoing, AIG's reported business prospects for its fiscal year 2007 were inaccurate.

## THE IMPROPER BUYBACK

87.     During February 2007, the Board authorized the repurchase of up to $8 billion of the Company's shares. Under the Board's authorization, while AIG's stock was artificially inflated due to the improper statements described above, the Company bought back over $3.7 billion worth of the Company's own shares at an average price of approximately $67.89 per share, which is substantially higher than AIG's current share price of less than $60 per share and comparable to the $70 per share the Insider Selling Defendants averaged in selling their own AIG stock holdings during the Relevant Period. On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the Company's exposure to the subprime mortgage lending crisis. While AIG was repurchasing these shares, the Insider Selling Defendants made the sales described herein.

## DAMAGES TO AIG CAUSED BY THE INDIVIDUAL DEFENDANTS

88.     As a result of the Individual Defendants' improprieties, AIG disseminated improper statements concerning its business prospects as alleged above. These improper statements have devastated AIG's credibility as reflected by the Company's $30 billion market capitalization loss.

89.     Further, as a direct and proximate result of the Individual Defendants' action, AIG has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to AIG; and

(b)     costs incurred from the $3.7 billion that AIG spent repurchasing its own inflated stock.

90.     Moreover, these actions have irreparably damaged AIG's corporate image and goodwill. For at least the foreseeable future, AIG will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior

-49-

and have misled the investing public, such that AIG's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## INSIDER SELLING

91. The Insider Selling Defendants, because of their positions, knew that the statements the Company publicly made were incorrect. They also knew that the misstatements would create an inflated stock price. The Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock for considerably more than they were worth. Therefore, while in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of AIG's stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **COHEN** | 11/28/2006 | 10,093 | $70.50 | $711,556.50 |
| | | **10,093** | | **$711,556.50** |
| | | | | |
| **NEUGER** | 11/30/2006 | 92 | $70.45 | $6,481.40 |
| | 11/30/2006 | 1,400 | $70.43 | $98,602.00 |
| | 11/30/2006 | 100 | $70.41 | $7,041.00 |
| | 11/30/2006 | 4,400 | $70.40 | $309,760.00 |
| | 11/30/2006 | 1,400 | $70.39 | $98,546.00 |
| | 11/30/2006 | 1,100 | $70.38 | $77,418.00 |
| | 11/30/2006 | 100 | $70.37 | $7,037.00 |
| | 11/30/2006 | 900 | $70.36 | $63,324.00 |
| | 11/30/2006 | 14,400 | $70.46 | $1,014,624.00 |
| | 11/30/2006 | 3,900 | $70.45 | $274,755.00 |
| | 11/30/2006 | 300 | $70.44 | $21,132.00 |
| | 11/30/2006 | 500 | $70.43 | $35,215.00 |
| | 11/30/2006 | 1,300 | $70.42 | $91,546.00 |
| | 11/30/2006 | 600 | $70.41 | $42,246.00 |
| | 11/30/2006 | 5,000 | $70.40 | $352,000.00 |
| | 11/30/2006 | 100 | $70.39 | $7,039.00 |
| | 11/30/2006 | 400 | $70.36 | $28,144.00 |
| | 11/30/2006 | 1,200 | $70.35 | $84,420.00 |
| | 11/30/2006 | 700 | $70.34 | $49,238.00 |
| | 11/30/2006 | 2,100 | $70.33 | $147,693.00 |
| | 11/30/2006 | 3,500 | $70.32 | $246,120.00 |
| | 11/30/2006 | 2,600 | $70.31 | $182,806.00 |
| | 11/30/2006 | 5,800 | $70.30 | $407,740.00 |
| | 11/30/2006 | 700 | $70.29 | $49,203.00 |
| | 11/30/2006 | 700 | $70.28 | $49,196.00 |
| | 11/30/2006 | 2,500 | $70.27 | $175,675.00 |
| | 11/30/2006 | 1,000 | $70.26 | $70,260.00 |

| | 11/30/2006 | 400 | $70.25 | $28,100.00 |
|---|---|---|---|---|
| | 11/30/2006 | 1,631 | $70.24 | $114,561.44 |
| | 11/30/2006 | 669 | $70.23 | $46,983.87 |
| | | 59,492 | | $4,186,906.71 |
| | | | | |
| **SCHREIBER** | 3/5/2007 | 3,500 | $69.45 | $243,075.00 |
| | | 3,500 | | $243,075.00 |
| | | | | |
| **WISNER** | 5/14/2007 | 14,062 | $72.43 | $1,018,510.66 |
| | 5/14/2007 | 2,812 | $72.43 | $203,673.16 |
| | | 16,874 | | $1,222,183.82 |
| | | | | |
| **TOTAL** | | 89,959 | | $6,363,722.03 |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

92.    Plaintiffs bring this action derivatively in the right and for the benefit of AIG to redress injuries suffered, and to be suffered, by AIG as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting thereof, by the Individual Defendants. AIG is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93.    Plaintiffs will adequately and fairly represent the interests of AIG in enforcing and prosecuting its rights.

94.    Plaintiffs are and were owners of the stock of AIG during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

95.    The Board of AIG at the time the original complaint was filed consisted of the following fifteen individuals: defendants Sullivan, Tse, Cohen, Feldstein, Futter, Hammerman, Holbrooke, Langhammer, Miles, Offit, Orr, Rometty, Sutton, Willumstad and Zarb.

96.    Defendants Sullivan, Tse, Cohen, Feldstein, Futter, Hammerman, Holbrooke, Langhammer, Miles, Offit, Orr, Rometty, Sutton, Willumstad and Zarb, as members of the Board during February 2007, authorized a share repurchase program under which the Company repurchased over $3.7 billion worth of its own shares at artificially inflated prices. The Board's decision to authorize the repurchase program was not the product of valid business judgment. Among other

-51 -

things, the Board failed to properly discuss or consider the negative effects that the subprime mortgage crisis would have or was already having on the Company's business prospects. Further, defendant Cohen engaged in self-dealing in that he sold his personally held shares while directing the Company to buy shares. Accordingly, demand was futile.

97.     Defendants Miles, Offit and Sutton were, during the Relevant Period, members of the Audit Committee. The Audit Committee's charter provides that the Audit Committee is responsible for reviewing and discussing earnings press releases and financial information and earnings guidance provided to analysts and rating agencies. Thus, the Audit Committee was responsible for overseeing and directly participating in the dissemination of AIG's earnings press releases. Accordingly, defendants Miles, Offit and Sutton breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee participated in the preparation of improper statements and earnings press releases that contained improper material information. Particularly, these defendants reviewed and failed to correct AIG's improper earnings press releases described above. Thus, Miles, Offit and Sutton face a sufficiently substantial likelihood of liability for their breach of fiduciary duties so any demand upon them was futile.

98.     The principal professional occupation of defendant Sullivan is his employment with AIG, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, AIG paid Sullivan the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $1,000,000 | $10,125,000 | $1,370,657 | $1,916,232 | $5,838,656 | $275,701 | $703,432 |

Accordingly, Sullivan lacks independence from defendants Cohen, Langhammer, Orr and Rometty, who are not disinterested and/or independent and who exert influence over Sullivan's compensation by virtue of their positions as members of the Compensation and Management Resources Committee. The Compensation and Management Resources Committee has the authority to review and approve Sullivan's base salary, bonus and equity compensation. This lack of independence

-52-

rendered defendant Sullivan incapable of impartially considering a demand to commence and vigorously prosecute this action.

99.     The principal professional occupation of defendant Tse is his employment with AIG, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, AIG paid Tse the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $849,729 | $1,838,455 | $3,729,295 | $3,354,527 | $5,860,619 | $193,060 |

Accordingly, Tse lacks independence from defendants Cohen, Langhammer, Orr and Rometty, who are not disinterested and/or independent and who exert influence over Tse's compensation by virtue of their positions as members of the Compensation and Management Resources Committee. The Compensation and Management Resources Committee has the authority to review and approve Tse's base salary, bonus and equity compensation. This lack of independence rendered defendant Tse incapable of impartially considering a demand to commence and vigorously prosecute this action.

100.    As a result of defendant Cohen's access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, he knew the adverse non-public information regarding AIG's true business prospects. While in possession of this material adverse non-public information regarding the Company, Cohen sold 10,093 shares of AIG stock for proceeds of $711,556.50. Because defendant Cohen received a personal financial benefit from the challenged insider trading transaction, he is interested. Moreover, defendant Cohen faces a sufficiently substantial threat of liability for breach of his fiduciary duties for insider selling. Since defendant Cohen breached his fiduciary duties and is interested, any demand upon him was futile.

101.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

102.    The Director Defendants of AIG, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to

-53-

conceal or disguise those wrongs from AIG's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

103.    The acts complained of constitute violations of the Exchange Act and violations of fiduciary duties owed by AIG's officers and directors and these acts are incapable of ratification.

104.    Each of the Director Defendants of AIG authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

105.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiffs, the Board has failed and refused to seek recovery for AIG for any of the wrongdoing alleged by plaintiffs herein.

106.    Plaintiffs have not made any demand on shareholders of AIG to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    AIG is a publicly held company with over 2.5 billion shares outstanding, and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Derivatively Against the Director Defendants and Defendant Bensinger for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

107.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

108.    During the Relevant Period, the Director Defendants and defendant Bensinger disseminated or approved public statements that improperly portrayed AIG's business prospects,

growth and margins. The Director Defendants and defendant Bensinger knew or deliberately disregarded that the Company's public statements concerning its business prospects were misleading.

109. The Insider Selling Defendants also sold over $6 million worth of shares of AIG's common stock at inflated prices during the Relevant Period while in possession of material non-public information. These defendants misappropriated AIG's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold AIG stock without disclosing the information alleged to have been concealed herein.

110. At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of AIG's business prospects, especially concerning the Company's exposure to the subprime mortgage market crisis, and the Insider Selling Defendants were selling stock into the market, the Director Defendants and defendant Bensinger were causing AIG to repurchase over $3.7 billion worth of its own stock on the open market at an average inflated price of approximately $67.89 per share, which is substantially higher than AIG's current share price of under $60 per share.

111. As such, the Director Defendants and defendant Bensinger violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

    (a)    employed devices, schemes and artifices to defraud;

    (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon AIG and others in connection with their purchases of AIG common stock during the Relevant Period.

112. As a result of the Director Defendants' and defendant Bensinger's misconduct, AIG has and will suffer damages in that it paid artificially inflated prices for AIG common stock purchased on the open market. AIG would not have purchased AIG common stock at the prices it paid, had the market previously been aware that the market price of AIG's stock was artificially and

falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, AIG suffered damages in connection with its purchases of AIG common stock during the Relevant Period. By reason of such conduct, the Director Defendants and defendant Bensinger are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Derivatively Against Defendants Sullivan, Bensinger, Miles, Offit and Sutton for Violation of §20(a) of the Exchange Act

113.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

114.    Defendant Sullivan, AIG's President and CEO, defendant Bensinger, AIG's CFO, and defendants Miles, Offit and Sutton, as members of the Audit Committee during the Relevant Period, directly or indirectly controlled or induced the Individual Defendants who violated §10(b) of the Exchange Act and Rule 10b-5 as alleged above.

115.    These defendants are jointly and severally liable to the same extent as the Individual Defendants under §20(a) of the Exchange Act. These defendants did not act in good faith.

## COUNT III

### Against All Defendants for Breach of Fiduciary Duty

116.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

117.    The Individual Defendants owed and owe AIG fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe AIG the highest obligation of good faith, fair dealing, loyalty and due care.

118.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

119.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the Company's business prospects and financial

results. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

120.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, AIG has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

121.    Plaintiffs, on behalf of AIG, have no adequate remedy at law.

## COUNT IV

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

122.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

123.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold AIG common stock on the basis of such information.

124.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold AIG common stock.

125.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of AIG common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

126.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

-57-

## COUNT V

### Against All Defendants for Waste of Corporate Assets

127.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

128.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets. In particular, by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, paying $3.7 billion to repurchase the Company' stock, paying bonuses to certain of its executive officers and incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions, the Individual Defendants have caused the Company to expend billions in wasted corporate assets.

129.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

130.    Plaintiffs, on behalf of AIG, have no adequate remedy at law.

## COUNT VI

### Against All Defendants for Unjust Enrichment

131.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

132.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of AIG.

133.    Plaintiffs, as shareholders and representatives of AIG, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.    Declaring that the Director Defendants and defendant Bensinger are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and that defendants Sullivan, Bensinger, Miles, Offit and Sutton are jointly and severally liable under §20(a) of the Exchange Act and awarding AIG damages;

C.    Directing AIG to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AIG and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of AIG to nominate at least three candidates for election to the Board;

3.    a proposal to ensure the accuracy of the qualifications of AIG's directors, executives and other employees;

4.    a proposal to control insider selling;

5.    a proposal to ensure that AIG prudently expends funds in stock repurchase programs; and

6.    appropriately test and then strengthen the internal audit and control functions.

D.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiffs on behalf of AIG have an effective remedy;

-59-

E.  Awarding to AIG restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.  Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

G.  Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: February 15, 2008

LAW OFFICES OF THOMAS G. AMON
THOMAS G. AMON

/s/ Thomas G. Amon
THOMAS G. AMON (TGA-1515)

250 West 57th Street, Suite 1316
New York, N.Y. 10107
Telephone: (212) 810-2431
Facsimile: (212) 810-2427

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
FELIPE J. ARROYO
JULIA M. WILLIAMS
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Co-Lead Counsel for Plaintiffs