UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

IN RE AMERICAN INTERNATIONAL GROUP,   :  No. 07 CV 10464 (LAP)
INC. 2007 DERIVATIVE LITIGATION

                        :

-------------------------------------------------------------------x
This Document Relates To

                        :

     ALL ACTIONS.
-------------------------------------------------------------------x

## REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY NOMINAL DEFENDANT AMERICAN INTERNATIONAL GROUP, INC.

WEIL, GOTSHAL & MANGES  LLP
767 Fifth Avenue
New York, NY 10153
212 310-8000 (Telephone)
212 310-8007 (Fax)

*Attorneys for Nominal Defendant*
*American International Group, Inc.*

July 16, 2008

NY1:\1563654\05\X$$%05!.DOC\14430.0043

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ...................................................................................................................... 2

PLAINTIFFS LACK STANDING TO BRING THIS DERIVATIVE ACTION ON
BEHALF OF AIG DUE TO PLAINTIFFS' FAILURE TO MAKE A DEMAND ................. 2

    A.    Rales Governs, And Plaintiffs Concede That Demand Is Not Excused
           Under Rales............................................................................................... 2

    B.    Even If Aronson Governs, Demand Is Not Excused Under Aronson .............. 3

    C.    Leave To Amend Without First Making Demand Should Not Be
           Granted.................................................................................................... 10

CONCLUSION

## TABLE OF AUTHORITIES

**Cases:**                                                                       **Page(s)**

Beam v. Stewart, 845 A.2d 1040 (Del. 2004)................................................................1

In re Countrywide Fin. Corp. Derivative Litig., 2008 WL 2064977 (C.D. Cal. May
    14, 2008) ................................................................................................6, 7, 8

Ferre v. McGrath, 2007 WL 1180650 (S.D.N.Y. Feb. 16, 2007)...................................4

Goldstein v. Pataki, 516 F.3d 50 (2d Cir. 2008), cert. denied, 2008 WL 891093 (June
    23, 2008) ..........................................................................................................6

Guttman v. Huang, 823 A.2d 492 (Del. Ch. 2003) .......................................................9

In re infoUSA, Inc. S'holders Litig., 2007 WL 2419611 (Del. Ch. Aug. 13, 2007).......10

Jones v. Jenkins, 503 F. Supp. 2d 1325 (D. Ariz. 2007)................................................4

In re Mut. Funds Inv. Litig. (In re Janus Subtrack), 384 F. Supp. 2d 873 (D. Md.
    2005) ................................................................................................................6

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) .............................................................9

In re Pfizer Inc. Derivative Sec. Litig., 503 F. Supp. 2d 680 (S.D.N.Y. 2007)..............10

Rist v. Stephenson, 2007 WL 2914252 (D. Col. Oct. 1, 2007) .................................4, 10

Stern v. LF Capital Partners, LLC, 820 A.2d 1143 (Del. Ch. 2003) ............................10

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 2008 WL
    2521676 (2d Cir. June 26, 2008) ......................................................................8

Thornton v. Micrografx, Inc., 878 F. Supp. 931 (N.D. Tex. 1995) ................................6

Wood v. Baum, 2008 WL 2600981 (Del. July 1, 2008)........................................1, 2, 4,
                                     9, 10

**Rules:**

Del. Ch. R. 15(aaa) .....................................................................................................10

Fed. R. Civ. P. 23.1 .......................................................................................................4

## PRELIMINARY STATEMENT

Since the filing of AIG's motion to dismiss this shareholder derivative action on April 15, 2008, AIG has been named as a defendant in numerous class action lawsuits in this Court alleging violations of Section 10(b) of the Securities Exchange Act of 1934 by AIG and seeking to recover hundreds of millions if not billions of dollars in alleged damages from AIG – the same damages plaintiffs here seek to recover under Section 10(b) and state law breach of fiduciary duty claims on behalf of AIG from the AIG directors and officers sued in this case. Disinterested and independent directors obviously can make a good faith business judgment that the interests of AIG and its shareholders would be best served by defending Section 10(b) claims, not asserting them. Starkly put, the issue before the Court is who makes that decision: two individual shareholders of AIG, or AIG's Board of Directors?

Plaintiffs cannot usurp the right to control litigation in AIG's name. They have not come close to pleading in accordance with the "stringent requirements of factual particularity" (AIG Mem. at 2, 6) – reaffirmed earlier this month by the Delaware Supreme Court in Wood v. Baum, 2008 WL 2600981, at *2 (Del. July 1, 2008) – why they should be excused from making the required pre-litigation demand on AIG's Board of Directors to bring the claims asserted here. To the contrary, plaintiffs state that "all reasonable inferences must be drawn in the light most favorable to the plaintiff." Pl. Mem. at 6 (emphasis omitted). Plaintiffs are wrong. The only inferences to be drawn in plaintiffs' favor are those that "log-ically flow from particularized facts alleged by the plaintiff." Wood, 2008 WL 2600981, at *2 (emphasis added); see also Beam v. Stewart, 845 A.2d 1040, 1048 (Del. 2004) (same). Plaintiffs have failed to allege any – much less particularized – facts excusing demand, and their claim that demand is excused should be dismissed with prejudice.

## ARGUMENT

## PLAINTIFFS LACK STANDING TO BRING THIS DERIVATIVE ACTION ON BEHALF OF AIG DUE TO PLAINTIFFS' FAILURE TO MAKE A DEMAND

As explained in AIG's opening memorandum, two alternative tests set out what a plaintiff must allege with particularity in order to excuse demand.

Where a decision made by a board of directors is challenged, the question whether demand is excused is governed by the Aronson test, pursuant to which "particularized facts" must be alleged that, if true, would create "a reasonable doubt" that "(1) 'the directors are disinterested and independent'" or "'(2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'" AIG Mem. at 7 (citations omitted); Pl. Mem. at 6. Where board action is not at issue, such as an alleged failure of oversight by directors, a different test, the Rales test, applies because no business judgment has been made and thus the second prong of the Aronson test is inapplicable. Under Rales, the court only addresses the first prong of Aronson – i.e., whether "particularized factual allegations . . . create a reasonable doubt that . . . the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." AIG Mem. at 7 (citations omitted); Wood, 2008 WL 2600981, at *2.

### A.    Rales Governs, And Plaintiffs Concede That Demand Is Not Excused Under Rales

Here, the Rales test applies. AIG's opening memorandum demonstrates that plaintiffs allege no facts – much less particularized facts – that show an affirmative board decision to make false or misleading statements concerning the corporation's exposure to losses from investments relating to subprime mortgages or an affirmative board decision to repurchase stock at prices that were too high. Rather, the facts alleged in plaintiffs' complaint describe a supposed failure to oversee corporate affairs, including an alleged failure to

be properly informed concerning the corporation's "exposure to the subprime mortgage crisis," resulting in directors "caus[ing] or allow[ing]" false or misleading statements to be made, and directors authorizing a stock repurchase at "artificially inflated" prices, because the directors failed to "properly discuss and consider the Company's exposure to the subprime mortgage lending crisis." AIG Mem. at 3-4, 8. As a result, the need for demand is governed by Rales. Id. at 9 (citing cases plaintiffs never address).

AIG's opening memorandum also shows that plaintiffs have failed to plead the particularized facts required to excuse demand under Rales. AIG Mem. at 9-19. Strikingly, plaintiffs' answering memorandum does not contend that the complaint alleges facts sufficient to excuse demand under Rales. Plaintiffs certainly do not dispute that the overwhelming majority of AIG's board consists of outside, non-management, non-employee directors (id. at 2, 3, 9-10), and plaintiffs concede that they "do not plead that the directors failed to implement adequate internal controls" (Pl. Mem. at 11 n.8) – the allegation most plaintiffs rely upon in efforts to satisfy Rales. AIG Mem. at 10-15.[1]

**B.    Even If Aronson Governs, Demand Is Not Excused Under Aronson**

Instead, plaintiffs contend that Aronson governs, because the facts alleged in their complaint supposedly show an affirmative board decision to make misstatements and an affirmative board decision to repurchase AIG stock in the market at prices that were too high. According to plaintiffs, their complaint alleges facts showing that "Defendants directed the Company to repurchase its own stock, knowing its value was inflated because AIG was not adequately exposing [sic] its exposure to the subprime crisis." Pl. Mem. at 8 (emphasis added). Plaintiffs state that they have pled that "[d]efendants knew or recklessly ignored . . .

---

[1] But see Pl. Mem. at 1 (stating that "[d]efendants failed to prevent or remedy internal control deficiencies" – an assertion plaintiffs never support and, on page 11, state they do not allege).

multiple red flags," that defendants had "knowledge of the widespread subprime market meltdown, which alerted the Board as to potential inaccuracies and future losses for AIG," and that "[d]efendants knew of the subprime crisis, and of the losses that AIG was certain to suffer due to their subprime exposure. Pl. Mem. at 7-9. And, plaintiffs state that AIG's directors had this knowledge "at the time they approved the stock repurchase" (i.e., in February 2007). Id. at 9 (emphasis in original). No facts, much less particularized facts, support these conclusory allegations.

Even assuming, for the sake of argument, that Aronson governs, "Delaware law on this point is clear: board approval of a transaction, even one that later proves to be improper, without more, is an insufficient basis to infer culpable knowledge or bad faith on the part of individual directors." Wood, 2008 WL 2600981, at *3. Rule 23.1 and Delaware law thus require "particularized factual allegations (not just conclusory assertions) about the defendant directors' actual knowledge." Ferre v. McGrath, 2007 WL 1180650, at *9 (S.D.N.Y. Feb. 16, 2007) (emphasis added). Under Delaware law, "plaintiffs must plead particularized facts underlying their allegations that the directors knew of . . . the misstatements." Rist v. Stephenson, 2007 WL 2914252, at *7 (D. Col. Oct. 1, 2007) (emphasis added). "[C]onclusory allegations" that directors were "aware of" or "'fully apprised' of problems . . . simply do not satisfy the particularity requirements of Delaware law." Jones v. Jenkins, 503 F. Supp. 2d 1325, 1335-36 (D. Ariz. 2007). Plaintiffs must do more than merely say that directors ignored "multiple red flags" (Pl. Mem. at 7); they must identify those "red flags."

Here, plaintiffs attempt to show that AIG's directors had "knowledge" of "losses that AIG was certain to suffer" in February 2007 by pointing to supposed "facts" and

"red flags" consisting of unspecified news articles in December 2006 reporting that "sub-prime mortgage delinquencies were mounting" and that February 2007 was "the same month that the top subprime mortgage lenders <u>began</u> announcing considerable losses and potential restatements." Pl. Mem. at 2, 3-4, 9 (emphasis added). According to plaintiffs, "several small subprime lenders had already declared bankruptcy," "[t]he largest subprime lender, New Century, had just announced that it would restate three quarters of earnings for 2006," "Accredited, the second largest subprime lender, had announced a massive Q4 loss and warned about bad debts in its portfolio," and "HSBC had announced that it had set aside $10.5 billion to cover bad loans in the United States." <u>Id</u>. at 9.

These "facts" do not begin to explain how AIG's directors <u>knew</u> "of . . . losses . . . AIG was <u>certain</u> to suffer." <u>Id</u>. at 9 (emphasis added). The "subprime mortgage lenders" whose losses plaintiffs rely upon were entities whose primary business was mortgage lend-ing. <u>See id</u>. at 2, 9 (referring to "subprime lenders"). AIG, by contrast, provides consumers "a wide range of financial and insurance services," and plaintiffs allege a loss (to this day, largely unrealized) in "AIG's investment portfolio, credit-swap portfolio and mortgage insur-ance business" (<u>id</u>. at 3, 5) – something different than the loan origination losses suffered by subprime mortgage lenders. And, plaintiffs do not (and cannot) deny what is stated in AIG's SEC filings: that the overwhelming majority of losses suffered by AIG arise out of "credit default swaps on super senior risk tranches of diversified pools of loans and debt securities" (Feb. 28, 2008 AIG Form 10K at 11, 33 (Allerhand Aff. Ex. A)) – <u>not</u> subprime mortgage lending; <u>see also</u> Pl. Mem. at 5 (AIG "was forced to disclose that it would need to alter the way it valued credit-default swaps").

Even, assuming, for the sake of argument, that AIG had the same subprime

business as the subprime lenders whose losses plaintiffs point to, that alone would not mean

that AIG, too, was "certain" to suffer the same losses. See In re Mut. Funds Inv. Litig. (In re

Janus Subtrack), 384 F. Supp. 2d 873, 879-80 (D. Md. 2005) (refusing to excuse demand

under Delaware law based on alleged "copious coverage" in "books and articles" of late

trading and market timing activities within the mutual fund industry, due to the absence of

allegations that the trustees of the Janus funds "knew that widespread late trading and market

timing activities were occurring within the Janus funds themselves") (emphasis added).

       Plaintiffs' theory also makes no sense. Why would directors who "knew" that

stock was worth far less than its market price authorize $3.7 billion in repurchases of that

stock at market prices? Even in a case involving ordinary notice pleading standards, this

Court need not accept a conclusion that "defies both logic and experience." Goldstein v.

Pataki, 516 F.3d 50, 63 (2d Cir. 2008), cert. denied, 2008 WL 891093 (June 23, 2008). This

Court certainly is not required "to leave its common sense at the courthouse steps." Thornton

v. Micrografx, Inc., 878 F. Supp. 931, 938 (N.D. Tex. 1995) (applying Second Circuit law).

       In re Countrywide Fin. Corp. Derivative Litig., 2008 WL 2064977 (C.D. Cal.

May 14, 2008), the principal case on which plaintiffs rely (Pl. Mem. at 7-9), illustrates the

particularized facts that plaintiffs must plead to excuse demand, and have failed to plead

here. Countrywide, like this case, involved alleged undisclosed exposure to subprime losses.

But the similarities end there. In Countrywide, the court held that the plaintiffs pled two

specific "red flags" that were sufficient to establish "a strong inference of deliberate reck-

lessness" sufficient to state a claim under Section 10(b) of the Securities Exchange Act of

1934 and "a 'sustained or systematic failure of the board to exercise oversight,' so as to

create a substantial likelihood of liability" that excused demand. 2008 WL 2064977, at *32.

Unlike the alleged red flags in this case, which involve losses at corporations other than AIG, the alleged red flags in Countrywide "implicate[d] deficiencies in underwriting" at Countrywide, and were supported by "accounts of numerous confidential witnesses . . . relating how Countrywide departed from its strict underwriting standards by generating large numbers of loans without proper regard for their quality" and the specific metrics summarized below. Id. at *3, 12 n.11. The court in Countrywide explicitly rejected "the pitfalls of other mortgage lenders" – and that is all that plaintiffs allege here – as too "attenuated" a link to establish the knowledge or recklessness required to excuse demand. Id. at *4, 12 n.11. This was true even though Countrywide was a case involving a sub-prime mortgage lender. By contrast, as noted above, AIG's alleged sub-prime losses principally arise out of credit default swaps "on super senior risk tranches of diversified pools of loans and debt securities" (Allerhand Aff. Ex. A at 11) – not lending losses of the type in Countrywide.

The first red flag found by the court in Countrywide was a "massive" and "meteoric rise in negative amortization" – from $29,000 in 2004 to $654 million in 2006 – resulting from pay option ARMs (adjustable rate mortgages) held for investment by Countrywide. Id. at *12, 13. The court explained that pay option ARMs provided "a low 'teaser' interest rate during an introductory period, followed by higher rates," and permitted a borrower "the option to pay a 'minimum' monthly payment less than the interest accruing that month, and add any remaining interest to loan principal." Id. at *2. The court stated that the "meteoric rise in negative amortization" "signaled that the Company's portfolio of pay-option ARMs was becoming increasingly risky," because negative amortization "added to the mortgage balances that pay-option ARM borrowers had to repay," presenting "a serious risk of default, since at some point increasing loan balances might no longer be justified by rising

home values." Id. at *13.  The court also pointed to the fact that "[t]he total amount of pay-option ARMs that Countrywide held for investment also rose dramatically, from $4.7 billion in 2004 to $32.7 billion in 2006." Id.

The second red flag found by the court in Countrywide was "increasing delin-quencies in Countrywide's riskiest loans" – pay-option ARMs and HELOCs (home equity lines of credit).  Id. at *12.  Plaintiffs alleged that "the percentage of pay-option ARMs in Countrywide's portfolio that were delinquent 90 days or more doubled from 2004 to 2005, and nearly tripled from 2005 to 2006," that "the percentage of HELOCs that were delinquent doubled each year from 2004-2006," that "[d]elinquencies in both categories, especially for pay-option ARMs, rose even more dramatically during each quarter in 2007," and that "by late 2007, HELOCs and pay-option ARMs combined accounted for 74% of Countrywide's investment portfolio and were valued at $59 billion." Id. at *13.

Nothing remotely similar to these two red flags is alleged in this case.  And, even if comparable red flags were alleged, the red flags in Countrywide were found to be red flags only with respect to directors – who constituted a majority of Countrywide's board – who served on board committees (the Audit & Ethics Committee, the Credit Committee, the Finance Committee, and the Operations & Public Policy Committee) "directly responsible for monitoring Countrywide's risk exposures and the financial performance of its loan port-folio" and "the quality of the loans originated and adherence to underwriting standards." Id. at *14-15, 16 n.23, 32.  Plaintiffs here do not allege that a majority of AIG's directors served on board committees comparable to the board committees in Countrywide.[2]

_____

[2] See also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 2008 WL 2521676, at *5 (2d Cir. June 26, 2008) ("'[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this

Plaintiffs' remaining arguments, with respect to Messrs. Sullivan, Tse, Cohen, Miles, Offit and Sutton, also fail. Plaintiffs concede that "the Board was comprised of fifteen directors" on the date plaintiffs filed this suit and that "demand is futile if Plaintiffs plead facts sufficient to create a reasonable doubt that eight of the directors would have been able to impartially consider a demand." Pl. Mem. at 2. Accordingly, even if plaintiffs were right with respect to these six directors, demand still would not be excused. Moreover,

- the allegation that Messrs. Miles, Offit and Sutton serve on AIG's audit committee (id. at 2, 9-11) fails because plaintiffs do not allege facts – much less with particularity – that "red flags" came to the attention of these directors as members of the audit committee, as in Countrywide. See AIG Mem. at 18-19 (citing cases); Wood, 2008 WL 2600981, at *4 (assertion that "membership on the Audit Committee is a sufficient basis to infer the requisite scienter" is "contrary to well-settled Delaware law"); and

- the allegation that Mr. Cohen engaged in insider trading (Pl. Mem. at 2, 13) fails because no facts are alleged showing that Mr. Cohen "knew of the sub-prime crisis, and of the losses that AIG was certain to suffer due to their sub-prime exposure" (id. at 9) on the November 28, 2006 date of his stock sale (Compl. ¶¶ 22, 91) – months before the February 2007 stock repurchase authorization.[3]

Nor is demand excused by plaintiffs' claim that their allegations should "be reviewed in totality" rather than individually. Pl. Mem. at 13-14. Demand is not excused

---

information'" (quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)); the court then held that "broad reference to raw data" that "lacks even an allegation that these data had been collected into reports that demonstrated that loan origination practices were undermining . . . collateral's performance" does not raise "an inference of scienter based on knowledge of or access to information demonstrating the inaccuracy of . . . public statements"; here, there is not even "broad reference to raw data," much less "an allegation that these data had been collected into reports" provided to a majority of AIG's directors).

[3] The case upon which plaintiffs rely for the proposition that insider trading allegations can excuse demand, Guttman v. Huang, 823 A.2d 492 (Del. Ch. 2003) (Pl. Mem. at 13), refused to excuse demand because "[t]he complaint . . . fails to allege particularized facts that support a rational inference that these five directors possessed information about NVIDIA's actual performance that was materially different than existed in the marketplace at the time they traded, much less than they consciously acted to exploit such superior knowledge." 823 A.2d at 505.

simply by "aggregating a number of factors, none of which excuses demand." In re Pfizer Inc. Derivative Sec. Litig., 503 F. Supp. 2d 680, 686 (S.D.N.Y. 2007) (Delaware law). Plaintiffs cannot "compensate for the weakness of each particular allegation through an appeal to their collective unwholesomeness." In re infoUSA, Inc. S'holders Litig., 2007 WL 2419611, at *2 (Del. Ch. Aug. 13, 2007); see also Rist, 2007 WL 2914252, at *11 ("[c]onsidering all of plaintiffs' conclusory allegations together . . . does not overcome the deficiencies identified in the allegations when considered separately").

In short, and as in Wood, "[t]his case is but another replay of other similar cases where the plaintiff failed to allege with particularity any facts from which it could be inferred that particular directors knew or should have been on notice of alleged accounting improprieties, and any facts suggesting that the board knowingly allowed or participated in a violation of law." 2008 WL 2600981, at *4.

## C.    Leave To Amend Without First Making Demand Should Not Be Granted

Plaintiffs' request for "leave to amend" without first making a demand (Pl. Mem. at 15 n.10) should be denied. Plaintiffs – who already have filed three complaints – do not suggest any new facts that could cure the defects in their current consolidated complaint, much less provide the Court a proposed amended complaint. Under Delaware law, "if a plaintiff chooses to file an answering brief in opposition to a motion to dismiss rather than amend the complaint, any subsequent dismissal pursuant to the motion 'shall be with prejudice unless the Court for good cause shown shall find that dismissal with prejudice would not be just under all the circumstances.'" Stern v. LF Capital Partners, LLC, 820 A.2d 1143, 1143-44 (Del. Ch. 2003) (quoting Del. Ch. R. 15(aaa)). Plaintiffs have not even tried to show "good cause." Plaintiffs should not receive special treatment in this Court that they would not receive if they asserted their Delaware claims in a Delaware court.

## CONCLUSION

Plaintiffs have not made the required demand and lack standing to sue. Their

Complaint must be dismissed.

Dated: New York, New York
       July 16, 2008

                                        WEIL, GOTSHAL & MANGES LLP

                                        By: _____
                                            Joseph S. Allerhand (JA-3201)
                                            Robert F. Carangelo (RC-3162)
                                            Kathleen E. Murphy (KM-6285)
                                        767 Fifth Avenue
                                        New York, NY 10153
                                        212 310-8000 (Telephone)
                                        212 310-8007 (Fax)

                                        *Attorneys for Nominal Defendant*
                                            *American International Group, Inc.*