UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

IN RE AMERICAN
INTERNATIONAL GROUP, INC.
DERIVATIVE LITIGATION

                                                    MASTER FILE
                                                    No.  07 Civ. 10464 (LTS)

This Document Relates To:
All Actions


--------------------------------------------------------x

### OPINION AND ORDER

APPEARANCES:


KAHN SWICK & FOTI, LLC                    WEIL, GOTSHAL & MANGES LLP
   By:  Albert Morris Myers, III, Esq.       By: Joseph S. Allerhand, Esq.
        Kevin L. Oufnac, Esq.                     Stephen A. Radin, Esq.
        Lewis Stephen Kahn, Esq.                  Robert F. Carangelo, Esq.
650 Poydras Street, Suite 2150                    Stacy Nettleton, Esq.
New Orleans, Louisiana 70130             767 Fifth Avenue
                                         New York, New York 10153

LAW OFFICES OF THOMAS G. AMON
   By: Thomas G. Amon, Esq.              *Counsel for Nominal Defendant*
250 West 57th Street, Suite 1316         *American International Group, Inc.*
New York, New York 10107


ROBBINS UMEDA, LLP
   By:  Brian James Robbins, Esq.
        Felipe J. Arroyo, Esq.
        Julia M. Williams, Esq.
600 B Street, Suite 1900
San Diego, California 92101



   *Co-lead Counsel for Plaintiff*

LAURA TAYLOR SWAIN, United States District Judge

Louisiana Municipal Police Employees Retirement System ("Plaintiff" or

"Louisiana Municipal") is the lead plaintiff in these consolidated derivative actions brought on

behalf of nominal defendant American International Group, Inc. ("AIG" or the "Company"), a

Delaware corporation, against individual current and former AIG directors and officers

(collectively, "Defendants") and, nominally, AIG, for breaches of fiduciary duty, waste of

corporate assets, unjust enrichment, and contribution.  Plaintiff also asserts claims for violations

of the Securities Exchange Act of 1934 ("Exchange Act") Section 20(a), 15 U.S.C. § 78t-1

("Section 20(a)"), Exchange Act Section 10(b), 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule

10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5 ").  The Court has jurisdiction

of this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

Plaintiff is, and has been throughout the Relevant Period (February 8, 2006,

through the present), an owner and holder of AIG common stock.  Plaintiff's claims are

predicated upon, among other things, the AIG officers and directors' alleged: failure to properly

oversee the Company's credit default swap contracts, which were largely based on subprime

mortage-backed collateralized debt obligations; and material misstatements and omissions

regarding AIG's financial health and risk management.  Plaintiff also asserts claims based on the

AIG Board of Directors' decision to increase AIG's dividend payment and authorize and execute

a common stock repurchase plan shortly before the Company faced a liquidity crisis, and its

approval of certain compensation arrangements with three senior executives and certain

personnel in AIG's Financial Products division.  AIG moves to dismiss Plaintiff's amended

consolidated complaint (the "Complaint" or "ACC") pursuant to Federal Rule of Civil Procedure

23.1, on the grounds that Plaintiff did not make a demand on the Company's Board of Directors

(the "Board") prior to bringing this derivative action and failed to plead with particularity why

such a demand would have been futile.[1]  The Court has considered carefully all of the parties'

submissions, including multiple notices of supplemental authority.  For the following reasons,

the Complaint is dismissed in its entirety for failure to fulfill the requirements of Federal Rule of

Civil Procedure 23.1.

### BACKGROUND

The following facts are taken from the Complaint, the documents incorporated by

reference therein, and public filings of which the Court may take judicial notice,[2] unless

otherwise noted.  AIG was founded by Cornelius Vander Starr in 1919.  Under the leadership of

Starr and his successor, Maurice Greenberg, it grew to employ more than 97,000 people,

underwrite more than $41 billion of insurance premiums annually, and serve more than 65

million customers worldwide.  The Company touted itself as a world leader in general insurance,

life insurance and retirement services, financial services, and asset management.  At the end of

---

[1]   All of the following defendants joined AIG's motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 23.1 (see docket entry no. 71) and also filed separate motions to dismiss: Alan Frost (docket entry no. 83), Steven Bensinger (docket entry no. 85), Andrew Forster (docket entry no. 88), Joseph Cassano (docket entry no. 91), Martin Sullivan (docket entry no. 97), and, jointly, Marshall Cohen, Martin Feldstein, Ellen Futter, Richard Holbrooke, George Miles, Jr, Stephen F. Bollenbach, Suzanne Nora Johnson, Morris Offit, Michael Sutton, James Orr, III, Virginia Rometty, Dennis Dammerman, Frank Zarb, Stephen Hammerman, Fred Langhammer, and Robert Willumstad (the "Outside Director Defendants") (docket entry no. 100).  These motions will be terminated in light of the resolution of the Company's motion.

[2]   See Citadel Equity Fund Ltd. v. Aquila, Inc., 168 Fed. App'x 474, 476 (2d Cir. 2006) (SEC filings are amenable to judicial notice).

its 2006 fiscal year it reported nearly a trillion dollars of assets on its balance sheet and enjoyed a market capitalization of over $180 billion.  Fewer than two years later, in September 2008, the Company faced a liquidity crisis (the "September 2008 Liquidity Crisis") that required an unprecedented bailout by the United States Government (the magnitude of which ultimately reached $173 billion) (the "September 2008 Government Bailout") in order to stave off bankruptcy.  (ACC ¶ 12.)  Plaintiff's 210-page pleading alleges, in copious detail, the facts that caused an erstwhile component of the prestigious Dow Jones Industrial Average to become dependent on taxpayer assistance for its survival.  As familiarity with the ACC and the motion papers is assumed, the Court will only provide a basic summary of the core allegations below.

<u>AIGFP and the Company's Credit Default Swap Portfolio</u>

In 1987, former AIG Chief Executive Officer Maurice Greenberg created AIG Financial Products ("AIGFP") in order to take advantage of the company's cash reserves, credit rating, and knowledge of the insurance industry by entering into derivative transactions.  AIGFP became a wholly-owned subsidiary of the company in 1993.  (ACC ¶ 124.)  Defendant Cassano was the President of AIGFP throughout the Relevant Period.

In 1998, AIGFP began engaging in a particular type of derivative transaction known as a credit default swap ("CDS"), in which it insured its counterparty against the credit risk of an underlying reference obligation, typically a fixed-income security.  AIGFP received fees and regular premium payments in exchange for its commitment to compensate the counterparty in the event the reference obligation defaulted or experienced any other defined credit event.  (ACC ¶¶ 127, 133.)  In 2005, AIGFP entered into a much larger volume of CDS contracts than it had in previous years and, in the bulk of those CDS contracts, the Company

assumed the credit risk of a collateralized debt obligation ("CDO").  These CDOs were collateralized by portfolios of miscellaneous financial assets, most commonly residential mortgage-backed securities.  AIG's dramatic expansion into the CDS market in 2005 thus had the effect of greatly increasing the Company's exposure to the residential mortgage market, particularly the subprime mortgage market.   (ACC ¶¶ 127-38.)  By early 2006, AIG's exposure to subprime CDOs had grown to $89 billion.  (ACC ¶ 141.)  This activity appeared profitable: AIGFP contributed 17.5% of the Company's overall operating income in 2005.  (ACC ¶ 142.)

The CDS portfolio put the Company at risk in three ways.  Most obviously, AIG would have to make large payments in the event that a significant proportion of the underlying reference securities defaulted.  Additionally, if the market value of the reference securities declined – due, for example, to a market perception that the mortgage-backed securities within the CDOs were increasingly likely to fall short of providing the expected cash flows because of increasing defaults on the underlying mortgages – AIG would be forced to post collateral to its counterparties to provide security that it could make good in the event of a default.  Morever, in such a scenario AIG would be required to mark-to-market the declining value of the CDS assets on its financial statements.  Such marking to market would cause it to recognize a loss on paper even before it experienced an actual economic loss.  (ACC ¶¶ 143-47.)

The CDS Risks Prompt the September 2008 Liquidity Crisis

As AIG underwrote an ever larger volume of unhedged credit default swaps on CDOs (often writing multiple swaps on the same CDO), its leveraged exposure to the credit market and, particularly, the subprime mortgage market, soared.  (ACC ¶¶ 143-47.)  That market, as has been extensively documented elsewhere, imploded: by late fall 2007, banks, brokerages,

and lenders had announced almost $50 billion in losses related to the writedown of subprime

mortgage-related products.  (ACC ¶ 178.)  On February 11, 2008, the Company issued a Form 8-

K that disclosed that the losses in its CDS portfolio exceeded by $4 billion the losses it had

announced previously.  (ACC ¶ 216.)  On February 28, 2008, the Company issued its Form 10-K

for fiscal year 2007, which revealed that AIG's CDS portfolio had declined by $6 billion more

than the amount disclosed in the February 11 8-K.  (ACC ¶ 222.)  Additional losses announced at

the end of the first quarter of 2008 "brought the Company's CDS portfolio to a cumulative $20.6

billion loss between October 2007 and May 2008."  (ACC ¶ 225.)  These losses continued

through the second quarter of 2008, causing the Company's September 2008 Liquidity Crisis, in

which a government bailout was necessary to save the Company from bankruptcy.  (ACC ¶ 229.)

Unwinding of the CDS Portfolio

_____AIGFP had stopped writing new credit default swaps on mortgage-backed CDOs

by the end of 2005.  (ACC ¶ 403.)  However, it did not take any measures to significantly reduce

the exposure it had accumulated, which had reached a notional value of $2.7 trillion, until after

the September 2008 Liquidity Crisis, which was itself largely the product of the CDS portfolio.

(ACC ¶ 278.)  In January 2009, aided by the funds received in the government bailout, AIG

began to unwind its CDS portfolio, and in doing so it often paid a full 100 cents on the dollar to

its counterparties.  (ACC ¶ 279.)  Plaintiff alleges that the Defendants responsible for this process

wasted corporate assets because they "took no steps to . . . assure that [the Company] received

the best settlement terms from its counterparties."  (ACC ¶ 279.)  Plaintiff further alleges that

Directors Liddy and Johnson have ties to CDS counterparty Goldman Sachs that call into

question whether they acted solely out of concern for AIG's best interests in settling those CDS

contracts.  Plaintiff similarly alleges that Director Offit's ties to Wachovia call into question his actions with respect to the settlement of CDS contracts with that entity.  (ACC ¶ 280.)

Alleged "Red Flags"

Plaintiff argues that numerous "red flags" that arose during the Relevant Period provided the Board with constructive knowledge that its CDS activity was increasingly placing AIG in peril.  Plaintiff also argues that these "red flags" provided the Board with constructive knowledge that the inadequacy of the Company's risk management and accounting systems (particularly with respect to its CDS portfolio) was perilous as well.  The "red flags" of greatest significance, according to Plaintiff, were: (i) warnings from AIG's primary federal regulator, the Office of Thrift Supervision ("OTS"), including a warning to the Board in March 2006 about the Company's risk management and financial reporting generally and a March 2008 Supervisory Letter critiquing the Company's risk management with respect to its CDS activities specifically (ACC ¶¶ 148-51); (ii) warnings from the Company's external auditor, PricewaterhouseCoopers ("PWC"), including warnings made to former CEO Sullivan in November 2007 and multiple warnings to the Audit Committee in December 2007, January 2008, and February 2008, concerning "material weaknesses . . . related to risk management" and the inadequacy of AIGFP's valuation process (ACC ¶¶ 187-90); (iii) the October 1, 2007, resignation of Joseph St. Denis, Vice President of Accounting Policy, due in part to his frustration that Cassano had been excluding him from the valuation process for the CDS portfolio (ACC ¶¶ 161-72); (iv) the deterioration of the subprime mortgage market throughout 2007 and the losses announced by numerous financial firms related to that market deterioration (ACC ¶¶ 178-83); (v) collateral calls made by CDS contract counterparties in August and October 2007 (ACC ¶¶ 173-77); and

(vi) the Company's recent history (under previous management) of accounting malfeasance, which occurred from 2000-2005 and required restatements of financial results as late as 2007 (ACC ¶¶ 122-24).

<u>The Company's Dividend Increase and Share Repurchases</u>

In May 2008, after the occurrence of many of the events described in the preceding paragraph, AIG announced that it would increase its dividend by 10% over the prior year, which "would cost AIG at least an additional $200 million per year in addition to the estimated $2 billion the dividend already cost the Company." (ACC ¶ 230.) Plaintiff alleges that "the dividend declaration was directly tied to the desire to compensate certain Officer Defendants," insofar as those Defendants had outstanding claims of entitlement to certain Company stock on which the dividend would be paid. (ACC ¶¶ 230-32.) Plaintiff alleges that increasing the dividend constituted corporate waste in light of the allegedly predictable September 2008 Liquidity Crisis.

Plaintiff similarly alleges that the Company's share repurchase program constituted corporate waste. The Board authorized a share repurchase program in the first quarter of 2007[3] and the Company repurchased approximately $7 billion worth of its own stock from March 2007 through April 2008, at an average price of $61 per share. (ACC ¶ 249.) Shortly thereafter, the Company raised capital to fortify its balance sheet by selling shares of its common stock at an average price of $38 per share. (ACC ¶ 249.) In short, AIG bought its own

---

[3] The ACC alleges at one point that the share repurchase program was authorized in March 2007 (ACC ¶ 118) and at another alleges it was authorized in February 2007 (ACC ¶ 235). Resolution of this inconsistency is unnecessary for the purposes of this Opinion and Order.

shares high and sold them low.  Plaintiff alleges that these unfavorable transactions were not the product of poor business judgment but, rather, the product of actionable willful misconduct.

AIG's Compensation of Senior Executives and AIGFP Personnel

Plaintiff asserts claims premised upon four compensation-related Board decisions: (i) approval of a March 31, 2008, separation agreement with defendant Cassano that classified his departure as "without cause," allowed him to retain his rights under the AIG Financial Products Corp. 2007 Special Incentive Plan, and provided him with a severance package that allegedly totaled $43 million, all despite the fact that Cassano's AIGFP business was chiefly responsible for the September 2008 Liquidity Crisis (ACC ¶¶ 290-93); (ii) a June 2008 determination that defendant Sullivan, upon his departure as CEO, was entitled to between $33 and $47 million in various forms of compensation, despite the fact that shortly before he announced his departure the Securities and Exchange Commission and the Department of Justice had announced that they were commencing investigations into potential wrongdoing at the Company (ACC ¶¶ 294-95); (iii) the June 2008 approval of a compensation package for defendant Willumstad, upon his selection as CEO following Sullivan's resignation, that included $24.5 million in AIG stock; and (iv) approval of the retention agreements that were signed with approximately 130 AIGFP personnel in March 2008 and pursuant to which payments were made in December 2008 and December 2009 despite the ruinous performance of AIGFP.  (ACC ¶¶ 287-89, 301-05.)

AIG's Board of Directors

The parties agree that the Board's composition on the date the ACC was filed is the relevant consideration for the purposes of the motion to dismiss the Complaint for failure to

make a demand.  (See Def.'s Reply, 3.)  As of June 3, 2009, the date that the ACC was filed, nine

individuals, all named as defendants in this action, served on the Board: Edmund S.W. Tse

("Tse"), Edward M. Liddy ("Liddy"), Martin S. Feldstein ("Feldstein"), George L. Miles

("Miles"), Morris W. Offit ("Offit"), James F. Orr III ("Orr"), Stephen F. Bollenbach

("Bollenbach"), Suzanne Nora Johnson ("Johnson"), and Dennis M. Dammerman

("Dammerman") (collectively, the "June 2009 Directors").[4]  (ACC ¶¶ 55-73.)  Liddy joined the

Company as Chief Executive Officer and Chairman of the Board on September 15, 2008.  (Id. at

¶ 58.)  The Company's June 5, 2009, proxy statement discloses that he received only one dollar

as his annual salary during the relevant period and that he did not receive any year-end variable

performance-based pay (i.e., a bonus), stock option grants, or long-term performance cash

awards.  (Allerhand Decl., Ex. 23.)  Tse was employed as AIG's Senior Vice Chairman - Life

Insurance during the relevant period and his daughter was employed by AIG during the relevant

period as well.  (ACC ¶¶ 57, 450.)  The other seven June 2009 Directors were non-executive

"outside directors."

       At all relevant times, Offit served on the Board's Audit Committee and Finance

Committee (ACC ¶¶ 442, 443), Miles served on the Audit Committee (ACC ¶ 442), Feldstein

---

[4]       Also named as individual defendants in the ACC are Martin J. Sullivan, the Chief
       Executive Officer of AIG until June 15, 2008; Robert B. Willumstad, the Chief
       Executive Officer of AIG from June 15, 2008, through September 18, 2008;
       former directors Marshall A. Cohen, Ellen V. Futter, Frank G. Zarb, Richard C.
       Holbrooke, Stephen L. Hammerman, Michael H. Sutton, Virginia M. Rometty,
       Fred H. Langhammer; and current or former executives Joseph Cassano, David L.
       Herzog, Andrew Forster, Win. J. Neuger, Frank G. Wisner, Brian T. Schreiber,
       Steven Bessinger, William N. Dooley, Frederick W. Geissinger, Elias F. Habayeb,
       Alan Frost, Robert E. Lewis, Thomas Athan ("Athan"), and Michael Roemer.
       (ACC ¶¶ 55-87.)  On September 1, 2009, the Court severed the claims against
       Athan.  See docket entries nos. 74, 104.

served on the Finance Committee (ACC ¶ 443), and Orr served on the Compensation and

Management Resources Committee (ACC ¶ 446).  Bollenbach joined the Board on January 16,

2008, and served on the Audit Committee from that date; he also joined the Finance Committee

on June 15, 2008, and the Compensation and Management Resources Committee on November

12, 2008.  (ACC ¶ 71).  Johnson joined the Board on July 16, 2008, and joined the Finance

Committee and the Compensation and Management Resources Committee on January 14, 2009.

(ACC ¶ 72.)[5]  Dammerman joined the Board on November 12, 2008 (ACC ¶ 73), and Plaintiff

has conceded in its submissions that there is no reason to doubt either his disinterestedness or his

independence with respect to any of the claims asserted in this action.  Most importantly for the

analysis that follows, neither Orr nor Tse served on either the Audit Committee or the Finance

Committees; Liddy and Dammerman joined the Board after the September 2008 Liquidity Crisis

(and thus after nearly all of the alleged wrongdoing had occurred); and Johnson joined the Board

shortly before the September 2008 Liquidity Crisis but did not join the Finance Committee until

January 2009.

            Plaintiff alleges that it would have been futile to make a demand on the Board that

it bring the claims asserted in this action because, among other things: wrongdoers dominated

and controlled the Board on the date the ACC was filed (ACC ¶ 464); the acts complained of are

violations of the Board members' fiduciary duties and were illegal and improper (and therefore

incapable of ratification) (ACC ¶ 468); the Company's directors' and officers' liability insurance

---

[5]            Feldstein and Bollenbach also served on the Nominating and Corporate
            Governance Committee (ACC ¶ 444) and Miles, Offit, Orr and Feldstein also
            served on the Regulatory, Compliance and Legal Committee (ACC ¶ 445).
            However, the ACC does not include particularized allegations demonstrating the
            relevance of service on any of these committees to Plaintiff's claims.

policies for the relevant period have an "insured vs. insured" exclusion that would expose these individuals to personal liability (ACC ¶¶ 467, 471); and the directors are disinclined to sue themselves and their fellow directors and top-ranking Company officials, with whom they have unspecified personal and professional relationships.  (ACC ¶ 470.)  Plaintiff also alleges that, as members of the various committees, the June 2009 Directors breached important specific duties, including duties outlined in the relevant committee charters, and therefore face a substantial likelihood of liability for their actions and omissions.  (ACC ¶¶ 442-46.)

<u>DISCUSSION</u>

Defendants move to dismiss the Complaint pursuant to Rule 23.1 of the Federal Rules of Civil Procedure based on Plaintiff's failure to make a pre-suit demand on the Board. Plaintiff argues that its pleading is sufficient to demonstrate that the demand requirement is excused and to satisfy the pleading standards with respect to its substantive claims.

<u>Rule 23.1 and Demand Futility</u>

"It is a long held principle of corporate law that directors manage the business of the corporation."  <u>Kernaghan v. Franklin</u>, No. 06 Civ. 1533, 2008 WL 4450268, at *3 (S.D.N.Y. Sept. 29, 2008) (citing <u>Aronson v. Lewis</u>, 473 A.2d 805, 811 (Del.1984), <u>overruled on other grounds by</u> <u>Brehm v. Eisner</u>, 746 A.2d 244 (Del. 2000)).  "By its very nature the derivative action impinges on the managerial freedom of directors."  <u>Aronson</u>, 473 A.2d at 811.  Thus, under Federal Rule of Civil Procedure 23.1, a plaintiff bringing a shareholders' derivative suit must state with particularity that the plaintiff has made a demand on the board of directors to take the requested action or the reasons for not making the demand.  Fed. R. Civ. P. 23.1(b); <u>accord</u> Del.

Ch. Ct. R. 23.1.[6]  "Rule 23.1 is not satisfied by conclusory statements or mere notice pleading."

Brehm v. Eisner, 746 A.2d 244, 254 (Del. 2000).  "Because Rule 23.1 requires that plaintiffs

make particularized allegations, it imposes a pleading standard higher than the normal standard

applicable to the analysis of a pleading challenged under Rule 12(b)(6)."  Kernaghan, 2008 WL

4450268, at *3.  Plaintiff asserts that it is excused from making a demand under Rule 23.1

because its pleading adequately alleges that to do so would have been futile.

There are two tests for determining demand futility under Delaware law.  The

two-pronged Aronson test applies where a plaintiff is challenging "conscious" board conduct.

Aronson, 473 A.2d at 813.  Such conscious conduct includes a conscious decision to refrain from

acting.  Id. at 813.  Under Aronson, "plaintiffs seeking to establish demand futility must plead

particularized facts that create a reasonable doubt that 1) the directors are disinterested and

independent, or that 2) the challenged transaction was a valid exercise of business judgment."  In

re Morgan Stanley Derivative Litig., 542 F. Supp. 2d 317, 321-22 (S.D.N.Y. 2008) (internal

quotation marks and citations omitted).  "The prongs of the Aronson test are in the disjunctive;

therefore, if plaintiff creates a reasonable doubt as to either prong of the test, demand is

excused."  Kahn v. Portnoy, No. 3515, 2008 WL 5197164, at *9 (Del. Ch. Dec. 11, 2008).

"[F]utility is gauged by the circumstances existing at the commencement of a derivative suit,"

Aronson, 473 A.2d at 810, and such reasonable doubt "must be raised as to a majority of the

---

[6]     AIG is organized and exists under the laws of the State of Delaware.  (ACC ¶ 54.)
Thus, the Court applies Delaware law in determining whether Plaintiff's pleading
satisfies Rule 23.1.  See Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133, 138 (2d
Cir. 2004) ("The substantive law which determines whether demand is, in fact,
futile is provided by the state of incorporation of the entity on whose behalf the
plaintiff is seeking relief.").

board of directors sitting at the time the complaint is filed," In re Morgan Stanley, 542 F. Supp. 2d at 322.  The existence of reasonable doubt "must be decided by the trial court on a case-by-case basis" and not by any "rote and inelastic" criteria.  Grobow v. Perot, 539 A.2d 180, 186 (Del. 1988), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).

The single-part Rales test applies "[w]here there is no conscious decision by directors to act or refrain from acting" and the Aronson test is thus inapplicable.  Rales v. Blasband, 634 A.2d 927, 933 (Del.1993).  As the Rales court noted, "[t]he absence of board action . . . makes it impossible to perform the essential inquiry contemplated by Aronson – whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction."  Id. at 933.  Accordingly, the Rales test focuses solely on the first part of the Aronson test: whether the plaintiff has alleged particularized facts creating a reasonable doubt that a majority of directors are disinterested and independent.  Id. at 933-34.  However, considerations of the business judgment rule inform the Rales analysis as well.  Plaintiffs frequently argue that there is reason to doubt that a majority of directors are disinterested because the complaint alleges director conduct "so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." In re Citigroup S'holder Derivative Litig., 964 A.2d 106, 121 (Del. Ch. 2009) (internal citations and quotation marks omitted).  There is presumptively a reason to doubt that a director who faces a substantial likelihood of liability could be disinterested when responding to a demand.  Id.

In this case, the Aronson test applies to Plaintiff's claims regarding the Board's decisions to increase the dividend and repurchase shares, as well as to all of the Board's challenged compensation-related decisions.  See Rales, 643 A.2d at 933 ("The essential predicate

for the <u>Aronson</u> test is the fact that a decision of the board of directors is being challenged in the derivative suit.").  The <u>Rales</u> test applies to Plaintiff's claims regarding the Board's alleged failures of oversight and failures of disclosure.  <u>See</u> <u>Wood v. Baum</u>, 953 A.2d 136, 140 (Del. 2008) ("The second (<u>Rales</u>) test applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties."); <u>In re Morgan Stanley</u>, 542 F. Supp. 2d at 322 (applying <u>Rales</u> test to claims predicated on alleged failure to disclose receipt of a Wells Notice).

Directorial interest exists where a director will receive a personal financial benefit from a transaction that is not equally shared by the stockholders or the corporation.  <u>Rales</u>, 634 A.2d at 933.  It also exists where a corporate decision will potentially have a materially detrimental impact on a director, but not on the corporation or the stockholders.  <u>Id.</u>  In the face of such adverse potential personal consequences, the director cannot be expected to exercise independent business judgment.  However, where a director's interest is based on his potential personal liability, the director can only be considered "interested" if the potential personal liability rises to "a substantial likelihood;" it is not sufficient that "a mere threat" of personal liability is alleged.  <u>Rales</u>, 634 A.2d at 933 (citing <u>Aronson</u>, 473 A.2d at 815); <u>see also</u> <u>Wood</u>, 953 A.2d at 141 n.11 ("In <u>Aronson</u>, this Court held that the mere threat of personal liability . . . is insufficient to challenge either the independence or disinterestedness of directors" and that a reasonable doubt that a majority of directors is incapable of considering demand should only be found where "a substantial likelihood of personal liability exists.") (internal quotation marks omitted).

"Independence means that a director's decision is based on the corporate merits of

the subject before the board rather than extraneous considerations or influences." <u>Aronson</u>, 473

A.2d at 816.  "[A] plaintiff charging domination and control of one or more directors must allege

particularized facts manifesting 'a direction of corporate conduct in such a way as to comport

with the wishes or interests of the corporation (or persons) doing the controlling.'" <u>Id.</u>, <u>quoting</u>

<u>Kaplan v. Centex Corp.</u>, 284 A.2d 119, 123 (Del. Ch. 1971); <u>see also</u> <u>Rales</u>, 634 A.2d at 936

("To establish lack of independence, [plaintiff] must show that the directors are "beholden" to

the [interested directors] or so under their influence that their discretion would be sterilized.").

  As noted above, the Board consisted of nine members at the time that the

Complaint was filed.   In the next portion of this opinion, the Court reviews the Complaint to

determine whether the factual allegations are sufficiently particularized to create a reasonable

doubt as to the disinterestedness or independence of at least five of the June 2009 Directors.

Thereafter, with respect to those claims to which the <u>Aronson</u> test applies, the Court also reviews

the Complaint to determine whether the Complaint's allegations are sufficient to raise a

reasonable doubt as to whether the challenged transactions were the product of a valid exercise of

business judgment.

<u>Allegations as to Lack of Disinterestedness and Independence</u>

  <u>General Demand Futility Allegations</u>

  Plaintiff makes various generalized allegations as to demand futility based on

director compensation, the directors' unwillingness to sue themselves, and the Company's

insurance policy exclusions.  These grounds have been repeatedly rejected by courts applying

Delaware law and the Court finds them unavailing for the following reasons.

_Compensation_

Plaintiff asserts that demand is futile because the June 2009 Directors would not take any action against themselves or fellow directors that would put their compensation in jeopardy.   "It is well established that allegations that defendants 'are paid for their services as directors' do not excuse demand."  Louisiana Mun. Police Employees Retirement System v. Blankfein, No. 08 Civ. 7605, 2009 WL 1422868, at *8 (quoting Grobow, 539 A.2d at 188); see also In re IAC/InterActiveCorp Securities Litig., 478 F. Supp. 2d 574, 602 (S.D.N.Y. 2007) ("Furthermore, the receipt of directors' fees does not constitute a disqualifying interest for the purposes of the demand requirement."); Fink v. Komansky, No. 03 Civ. 0388, 2004 WL 2813166, at *7 (S.D.N.Y. Dec. 8, 2004) ("Without specific facts suggesting a lack of independence by the Board, receipt by directors of benefits and compensation as a result of Board membership is insufficient to excuse demand.  To rule otherwise would only circumvent the purpose of the demand requirement and render Rule 23.1 useless.") (internal citations omitted); A.R. DeMarco Enterprises, Inc. v. Ocean Spray Cranberries, Inc., No. 19133, 2002 WL 31820970, at *5 (Del. Ch. 2002) ("It is well established in Delaware law that ordinary director compensation alone is not enough to show demand futility.").

Plaintiff does not allege that the compensation that these directors received was anything other than customary director compensation.  See Orman v. Cullman, 794 A.2d 5, 29 n.62 (Del. Ch. 2002) (noting that those cases holding that directors' fees did not constitute a financial interest "were based on circumstances in which the fees paid to directors were customary and usual in amount.  [And] . . . the disqualifying effect of such fees might be different if the fees were shown to exceed materially what is commonly understood and accepted

to be a usual and customary director's fee."); see also Halpert Enter., Inc. v. Harrison, 362 F.

Supp. 2d 426, 433 (S.D.N.Y. 2005) ("The allegations that the Board members receive various

fees from [the company] are similarly unavailing, because there are no particularized allegations

indicating that that compensation is excessive.").  Thus, Plaintiff's allegations regarding director

compensation do not raise any reasonable doubt as to directorial disinterestedness.

### Forced to Sue Themselves / "Insured vs. Insured" Exception

Plaintiff argues that demand on the Board would have been futile because the

June 2009 Directors would have been forced to sue themselves, their fellow directors and their

allies in the top ranks of the Company, in order to bring this suit.  As the Aronson court

recognized, this "bootstrap" argument that demand is excused because to "plac[e] the conduct of

the litigation in hostile hands [would] . . . preven[t] its effective prosecution" has long been made

to and dismissed by courts.  Aronson, 473 A.2d at 818; see also Ferre v. McGrath. No. 06 Civ.

1684, 2007 WL 1180650, at *7 (S.D.N.Y. Feb. 16, 2007) ("The rote allegation that directors

would have to sue themselves has been consistently rejected as a basis for excusing demand.").

To excuse plaintiffs from the demand requirement whenever directors were named as defendants

would be to vitiate Rule 23.1. Thus, "[u]nless facts are alleged with particularity to overcome the

presumptions of independence and a proper exercise of business judgment, in which case the

directors could not be expected to sue themselves, a bare claim of this sort raises no legally

cognizable issue under Delaware corporate law."  Id. at 818; see also Pogostin v. Rice, 480 A.2d

619, 624 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000)

("[W]e note that the plaintiffs' bootstrap allegations of futility, based on claims of directorial

participation in and liability for the wrongs alleged, coupled with a reluctance by directors to sue

themselves, were laid to rest in <u>Aronson</u>.").

   Similarly, demand futility based on the existence of an "insured vs. insured"

exclusion in the Company's directors' and officers' liability insurance policies is an "argument

[that] has been rejected repeatedly under Delaware law." <u>Ferre v. McGrath</u>, No. 06 Civ. 1684,

2007 WL 1180650, at *8 (S.DN.Y. 2007); <u>see also</u> <u>Kernaghan v. Franklin</u>, No. 06 Civ. 1533,

2008 WL 4450268, at *7 (S.DN.Y. 2008) ("Plaintiff's allegation that the Defendants' directors'

and officers' liability insurance policies have an 'insured v. insured' exclusion that precludes

coverage for derivative suits filed against them [is] also insufficient to create a reasonable doubt

as to disinterestedness."); <u>Halpert Enter.</u>, 362 F. Supp. 2d at 433 ("That the insurance policy

indemnifying defendants would not cover their liability were the corporation itself to bring suit

against them is also not a sufficiently particular basis for inferring demand futility.").

<u>Allegations Premised on Exposure to Personal Liability</u>

  <u>Claim for Breach of Fiduciary Duty Premised upon Failure of Oversight</u>

     Plaintiff asserts that Defendants "violated and breached their fiduciary duties . . .

by mismanaging the Company's CDS business and investments in CDOs backed by subprime

mortgages and by concealing the Company's exposure and foreseeable losses arising from these

operations."[7]  (ACC ¶ 500.)  The Complaint identifies various alleged breaches of fiduciary duty,

including: the repurchase of shares at prices that Defendants allegedly knew or should have

---

[7]  In light of the Court's decision to dismiss the Complaint for failure to comply
with the requirements of Federal Rule of Civil Procedure 23.1, the Court need not
determine whether Plaintiff has adequately stated a claim based upon any of the
alleged misconduct as to any individual or group of defendants.  Accordingly, for
narrative convenience and for the purposes of this Opinion and Order only, the
Court refers generally to "Defendants" when discussing the factual allegations.

known were artificially inflated; the failure to implement proper accounting and control procedures in the face of warnings from external auditors and regulators that the Company's procedures in this regard were inadequate; and the payment of excessive compensation to executives whom Defendants knew or should have known had damaged the corporation.  All of these allegations rely on the assertion that, due to the purported "red flags" identified in the Complaint, Defendants knew or should have known that the Company's CDS portfolio was placing the Company in peril and Defendants' failure to take any preventative action constitutes an actionable failure of oversight.

Applying the Rales test to Plaintiff's allegations regarding the involvement of the June 2009 Directors in the alleged breaches, the Court considers whether Plaintiff has pleaded sufficient particularized facts to create, by demonstrating a substantial likelihood of personal liability, a reasonable doubt that five of the nine June 2009 Directors could have exercised disinterested and independent judgment with respect to a demand to assert the claims.

### Liddy and Plaintiff's Failure of Oversight Claim

Liddy joined the Board and became AIG's CEO on September 18, 2008, in the wake of the September 2008 Government Bailout.  Accordingly, Liddy does not face a substantial likelihood of liability for any of the claims that are based on events that occurred prior to the September 2008 Liquidity Crisis.  Plaintiff has not alleged any particularized facts creating any other basis for a reasonable doubt that Liddy would be disinterested and independent with respect to a demand to assert this claim.[8]  The fact that Liddy was employed by AIG at the time

---

[8]     Plaintiff's allegation that there is reason to doubt Liddy's disinterestedness due to his affiliation with Goldman Sachs is only relevant to the claims arising out of AIG's unwinding of its CDS portfolio after the September 2008 Liquidity Crisis.

of the filing of the Complaint merely indicates that his interests were aligned with the corporation's interests, and is not a ground for challenging his disinterestedness.  In re Dow Chemical Co. Derivative Litig., No. 4349, 2010 WL 66769, at *8 (Del. Ch. 2010) ("[P]laintiffs allege that the three inside directors . . . depend for their livelihood on [the nominal corporation defendant] . . . [W]here a director is beholden to the company there is no reason to doubt her loyalty to that company.  Her interests are aligned with the company and presumably she is able to make decisions in the best interests of the company.")  Accordingly, the Court concludes that Plaintiff's allegations fail to demonstrate a substantial likelihood of liability on Liddy's part with respect to this claim, and that there is thus no reason to doubt Liddy's disinterestedness and independence with respect to this claim.

### Tse's Independence

Tse was an AIG executive at the time the Complaint was filed.  For the reasons explained in the previous section, the fact that he and his daughter were employed by the Company merely indicates that his interests were aligned with the Company's interests, and is not a ground for challenging his disinterestedness.  Plaintiff argues, however, that there is reason to doubt Tse's independence from Liddy because Liddy was superior to Tse in the corporate hierarchy.  A director's dominance of another is only a concern, however, if the dominating director is himself otherwise interested.  In re Dow Chemical, 2010 WL 66769 at *8 ("Plainly put, the beholdenness or dominance of any director is irrelevant because there is no fear that the dominating director, without a personal or adverse interest, will do anything contrary to the best interest of the company and its stockholders.").  In the cases cited by Plaintiff to support its argument here, the courts had found that there was a reason to doubt the disinterestedness of the

allegedly dominant director.  See In re Cooper Companies Inc. S'holder Deriv. Litig., No. 12584, 2000 WL 1664167, at *7 (Del. Ch. 2000); Mizel v. Connelly, No. 16638, 1999 WL 550369, at *1 (Del. Ch. 1999).   As explained above, there is no reason to doubt Liddy's disinterestedness, and therefore Tse's alleged dependence on Liddy does not further Plaintiff's demand futility claim.  The only potential remaining ground for finding a reason to doubt Tse's disinterestedness is the possibility that he faces a substantial likelihood of personal liability with respect to Plaintiff's failure of oversight claim, which is discussed in the next section of this Opinion.

### Orr, Tse and Plaintiff's Failure of Oversight Claim

"Director liability based on the duty of oversight is possibly the most difficult theory in corporate law upon which a plaintiff may hope to win a judgment."  In re Citigroup Inc. S'holder Deriv. Litig., 964 A.2d 106, 125 (Del. Ch. 2009) (quoting In re Caremark Int'l Derivative Litig., 698 A.2d 959, 967 (Del. Ch. 1996)).  "Only a sustained or systematic failure of a board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability."  In re Caremark Int'l, 698 A.2d at 971.

A plaintiff may not support a claim for liability based on the duty of oversight (known as a "Caremark claim") merely by identifying signs of general difficulty in the market in which the company participates and asserting that the defendants should be held liable for exercising their business judgment in a manner that appears to have been inconsistent with those indications.  See Blankfein, 2009 WL 1422868 at *5 ("The principal 'red flags' in the Complaint seek to base liability on a failure of the Board to respond correctly to signs that the ARS market was not as healthy and liquid as some employees at Goldman Sachs believed or represented it to

be . . . These are exactly the kinds of allegations that the <u>Citigroup</u> court found do not state a

claim for relief under <u>Caremark</u>, as they are not evidence that the directors consciously

disregarded their duties or otherwise acted in bad faith.") (citing <u>In re Citigroup Inc.</u>, 964 A.2d at

127, and <u>In re Caremark Int'l</u>, 698 A.2d at 967).

 Rather, a plaintiff must plead particularized facts showing that the directors "knew

they were not discharging their fiduciary obligations" or "demonstrated a conscious disregard for

their responsibilities such as by failing to act in the face of a known duty to act." <u>In re Citigroup</u>,

964 A.2d at 123.  Furthermore, "the duty to act in good faith to be informed cannot be thought to

require directors to possess detailed information about all aspects of the operation of the

enterprise.  Such a requirement would simply be inconsistent with the scale and scope of efficient

organization size in this technological age," <u>In re Caremark Int'l</u>, 698 A.2d at 971, and,

accordingly, directors are entitled to rely on management to make managerial decisions,[9] <u>In re</u>

<u>Healthsouth Corp. S'holders Litig.</u>, 845 A.2d 1096, 1107 (Del. Ch. 2003), <u>aff'd mem.</u>, 847 A.2d

1121 (Del. 2004) ("Health-South's Board of Directors was entitled to rely upon [its CEO] and his

management team, particularly in the preparation of the company's financial statements, an area

in which management has traditionally been preeminent.").

 Plaintiff has not pleaded sufficient particularized facts to demonstrate that either

Orr or Tse faces a "substantial likelihood" of personal liability on its <u>Caremark</u> claim.  Neither

Orr nor Tse served on either the Finance or the Audit Committees.  Therefore they did not

assume the particular responsibilities related to the Company's financing and accounting that

---

[9] Plaintiff has not pleaded any particularized facts alleging that Tse's executive
position as Senior Vice Chairman - Life Insurance is relevant to his knowledge or
Board duties for purposes of this analysis.

were attendant to membership of those committees.  In order to face a "substantial likelihood" of personal liability on a Caremark claim, Orr and Tse would have had to have been sufficiently aware of the risks to the Company posed by the CDS portfolio that their inaction would constitute "a conscious disregard for their responsibilities such as by failing to act in the face of a known duty to act."  In re Citigroup, 964 A.2d at 123.  Plaintiff's particularized allegations indicate that Orr and Tse knew or should have known of only a few of the "red flags" identified by Plaintiff and therefore fall far short of pleading that these directors could face a substantial risk of liability for "a sustained or systematic failure . . . to exercise oversight."   In re Caremark Int'l, 698 A.2d at 971; see also Guttman v. Huang, 823 A.2d 492, 503 (Del. Ch. 2003) (demand excusal on a failure of oversight claim requires plaintiff to identify, at the very least, "well-pled, particularized allegations of fact detailing the precise roles that those directors played at the company" and "the information that would have come to their attention in those roles").

       Plaintiff has not pleaded sufficient particularized facts indicating that Orr and Tse were aware of the warnings by the Company's external auditor, PWC, that Plaintiff alleges constitute "red flags."  PWC warned executives Sullivan and Bensinger about certain risk management issues in November 2007.  (ACC ¶ 188.)  PWC also warned the Audit Committee that AIG could have a material weakness relating to risk management on January 15, 2008 (ACC ¶ 188), and it again warned the Audit Committee on February 7, 2008, "that it viewed AIGFP's valuation process as insular and as having determined valuations without oversight of AIG management" (ACC ¶ 190).  PWC representatives similarly expressed concerns to the Audit Committee in a meeting in December 2007 (ACC ¶ 189) and on February 26, 2008 (ACC ¶ 221).  The only such warnings allegedly communicated to either Orr or Tse were those given at the

February 26, 2008, meeting, which Orr (but not Tse) attended.[10]  (ACC ¶ 221.)

       Plaintiff has not pleaded any particularized facts indicating that Orr or Tse was aware of the circumstances surrounding the resignation of St. Denis, the Vice President of Accounting Policy.  (ACC ¶ 170 ("Defendant Roemer . . . indicated that he would relay the information from Mr. St. Denis to the AIG Audit Committee").)  Nor has Plaintiff pleaded any particularized facts to suggest that the resignation of St. Denis was of sufficient importance to the Company, or to the specific affairs of the Company that were the responsibility of any committee on which Orr or Tse served, that these directors' failure to be aware of the reasons he provided for his resignation would constitute a breach of duty.  Accordingly, based on the particularized allegations in the pleading, the Court concludes that it would "simply be inconsistent with the scale and scope" of AIG to expect these directors to be aware of, and responsive to, St. Denis' resignation.  In re Caremark Int'l, 698 A.2d at 971.

       Plaintiff similarly has not, despite the extensive tools available to plaintiffs bringing derivative actions under Delaware law,[11] pleaded any particularized facts to support an inference that either Orr or Tse was aware of the collateral demands made by AIG's CDS counterparties in August and October 2007.  These collateral calls allegedly included demands for $4.5 billion of collateral, although AIG ultimately paid considerably less than what was

---

[10]    The Complaint does not include any allegations explaining why Orr attended this meeting (given that he was not a member of the Audit Committee) or what role, if any, he played at the meeting.  (ACC ¶ 221.)

[11]    See, e.g., In re ITT Corp. Derivative Litig., 588 F. Supp. 2d 502, 511 (S.D.N.Y. 2008) (noting that plaintiffs, under Delaware law, enjoy a right to inspect corporate books and records).

initially demanded.[12]  By Plaintiff's own admission, the notional value of the Company's CDS

portfolio reached $2.7 <u>trillion</u> and AIGFP acquired or originated "thousands" of CDS contracts in

the relevant period.  (ACC ¶ 278.)  Plaintiff has not pleaded any particularized facts

demonstrating that these few collateral demands, in the context of the enormous scope of the

Company's CDS activity, were of sufficient gravity that AIG's directors – at least those who did

not serve on either the Finance or Audit Committees – should have been aware of them.

Of the warnings given to AIG by its primary regulator, the Office of Thrift

Supervision ("OTS"), only two relate specifically to the Company's management of its CDS

portfolio and its attendant risks: the 2007 Review and the March 2008 Supervisory Letter.  (ACC

¶¶ 150-51.)  Both Orr and Tse were aware of these developments.  They were also aware that, in

response, the Company's management, under the supervision of the Audit Committee, worked

actively with the Company's external auditors (ACC ¶ 189), publicly reported the previous

failures of its internal controls (ACC ¶ 209), altered the techniques it used to value the CDSs

(ACC ¶ 214), and submitted a (tardy) corrective action plan to OTS in May 2008 (ACC ¶

442(z)).  Plaintiff has not pleaded particularized facts demonstrating that Orr and Tse were not

entitled to rely on management's determination that these were adequate responses to OTS's

concerns.  <u>See</u> <u>In re Healthsouth Corp.</u>, 845 A.2d at 1107.

---

[12]     Plaintiff alleges that Goldman Sachs demanded that AIG post $1.5 billion in
collateral in August 2007.  After negotiations, AIG posted $450 million in
collateral.  In October 2007, Goldman Sachs demanded $3 billion in collateral,
and AIG agreed to post $1.5 billion.  (ACC ¶¶ 173, 177.)  Plaintiff also alleges
that "Deutsche Bank, Societe Generale, and other respected counterparties" made
collateral calls in August and October 2007, without specifying the amount
demanded by these counterparties or the amount, if any, that AIG posted.  (ACC ¶
286.)

Plaintiff also argues that, throughout 2007, there were numerous indications in the financial markets that the subprime mortgage market was in crisis, causing heavy losses for firms that had significant exposure to this market.  (ACC ¶¶ 178-91.)  These types of general warnings about difficulties in a sector of the financial markets, however, were insufficient to have put Orr and Tse on notice of any risk particular to AIG, absent other indicia that Orr and Tse knew or should have known of the extent of the Company's exposure to the subprime market and were not entitled to rely on management to make appropriate decisions regarding that exposure.  See Blankfein, 2009 WL 1422868, at *5.

Plaintiff relies on In re Countrywide Fin. Corp. Derivative Litig., 554 F. Supp. 2d 1044, 1082 (C.D. Cal. 2008), for the proposition that "failure to act in good faith can be shown when a director is alerted to dangers in the corporation's core business by certain 'red flags' and yet fails to act in the face of these 'red flags.'"  Pl. Opp. 17.   In Countrywide, the court concluded that "Plaintiffs [identified] at least two 'red flags' of such prominence that Individual Defendants must necessarily have examined and considered them in the course of their Committee oversight duties."  In re Countrywide, 554 F. Supp. 2d at 1060.  These Countrywide individual defendants were members of Board committees "charged with oversight of Countrywide's risk exposures, investment portfolio, and loan loss reserves," In re Countrywide, 554 F. Supp. 2d at 1062, and the red flags "implicated underwriting practices at the core of Countrywide's business model," In re Countrywide, 554 F. Supp. 2d at 1064.  Here, in contrast, Plaintiff has not pleaded any particularized facts alleging that Orr or Tse, in the course of carrying out their responsibilities as Board members generally or as Board committee members particularly, would have become aware of any "red flags" demonstrating serious risks at the core

of AIG's business.  In light of the few purported indicia of risks to the Company's business of which Orr and Tse were or should have been aware, and the actions that AIG's management appeared to take in response, the Court concludes that Plaintiff has failed to demonstrate that either Orr or Tse faces a substantial likelihood of liability on a <u>Caremark</u> claim.

### *Johnson, Dammerman and Plaintiff's Failure of Oversight Claim*

Dammerman joined the Board after the September 2008 Liquidity Crisis.  Johnson joined the Board in July 2008 and did not join the Finance Committee until January 2009, after the September 2008 Liquidity Crisis.   For substantially the reasons explained above in the Court's analysis of the allegations concerning Orr and Tse, the Court concludes that Dammerman and Johnson do not face a substantial likelihood of liability on a <u>Caremark</u> claim premised upon their breach of their fiduciary duty of oversight with respect to the management of the CDS portfolio.

The Court thus concludes that, with respect to at least five of the nine June 2009 Directors – Liddy, Tse, Orr, Johnson and Dammerman – there is no reason to doubt that they would have been disinterested and independent had they been presented with a demand to assert Plaintiff's <u>Caremark</u> claim.  Accordingly, the <u>Caremark</u> claim (included in Count III of the ACC) is dismissed for failure to make a pre-suit demand.

### <u>Plaintiff's Claim for Breach of the Duty of Disclosure</u>

Plaintiff complains that Defendants "had actual or constructive knowledge, and/or knowingly caused and/or permitted the Company to improperly misrepresent the Company's business prospects and financial results and condition, and/or consciously disregarded their duty to prevent AIG from misrepresenting the Company's exposure" to the subprime mortgage

market.  (ACC ¶ 502.)  Plaintiff argues that the "red flags" alleged in the Complaint lead to a reasonable inference that the June 2009 Director Defendants knew that certain disclosures regarding the Company's exposure to subprime assets were misleading.

A duty of disclosure claim must show that the directors "deliberately misinform[ed] shareholders about the business of the corporation, either directly or by a public statement."  In re Citigroup, 964 A.2d at 132.  For the reasons stated above, the Court concludes that Liddy, Johnson, and Dammerman do not face a substantial likelihood of liability on this claim owing to the late date at which they joined AIG's Board, and that Tse and Orr do not face a substantial likelihood of liability on this claim owing to the dearth of particularized allegations supporting an inference that they knew or should have known of the extent of the Company's exposure to the subprime mortgage market.  Accordingly,  the breach of the duty of disclosure claim (included in Count III of the ACC) is dismissed for failure to make a pre-suit demand.[13]

Plaintiff's Claims for Violations of the Federal Securities Laws

Plaintiff asserts claims based on Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.[14]  Rule 10b-5 provides:

---

[13]    The Court therefore need not reach the question of whether Plaintiff has made sufficient particularized allegations showing that these Defendants were responsible for the public statements and public filings that Plaintiff alleges are actionable.  See  In re Citigroup, 964 A.2d at 133 n.88 (Del. Ch. 2009) (explaining that simply "pleading that director defendants 'caused' or 'caused or allowed' the Company to issue certain statements is not sufficient particularized pleading to excuse demand under Rule 23.1.").

[14]    Section 10(b) of the Exchange Act provides,

It shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or

> It shall be unlawful for any person  . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Plaintiff alleges that Defendants made untrue statements of material facts and omitted material facts related to the Company's CDS portfolio; these misstatements and omissions deceived the market and thereby artificially inflated AIG's share price; and the Company subsequently repurchased its shares at artificially inflated prices.  However, Plaintiff must allege particularized facts giving rise to a "strong inference of scienter" to state a claim under Section 10(b).  15 U.S.C.A. § 78u-4(b)(2) (West 2009).  The inference of scienter must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).  Plaintiff's claim for secondary liability under Section 20(a) depends upon the successful statement of a claim under Section 10(b).  ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan, 553 F.3d 187, 207 (2d Cir. 2009).

The scienter element of Plaintiff's securities law claims relies on the premise that "Defendants knew that AIG faced massive exposure to the collapse in the subprime mortgage market."  (ACC ¶ 475.)  As explained above, Plaintiff's complaint does not allege particularized

---

> deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C.A. § 78j(b) (West 2009).

facts giving rise to an inference that Orr or Tse had or should have had such knowledge, and therefore there is no reason to doubt Orr or Tse's disinterestedness based on a substantial likelihood that they would face liability for these claims.  Furthermore, Liddy, Johnson and Dammenbach all joined the Board after the AIG share repurchase program had been concluded, so none of them faces any potential for liability on Plaintiff's claims under the securities laws, all of which relate to that share repurchase program.  (See ACC ¶¶ 306, 475.)  Accordingly, the Court concludes that Plaintiff has not pleaded particularized allegations demonstrating that Orr, Tse, Liddy, Johnson or Dammenbach face a substantial likelihood of liability on these claim, nor has it pleaded particularized allegations sufficient to create any other reason to doubt the disinterestedness and independence of these directors with respect to these claims.  Accordingly, Plaintiff's claims for violations of the securities laws (Counts I and II of the ACC) are dismissed for failure to make a pre-suit demand.

<u>Plaintiff's Waste Claim: the Share Repurchase and Dividend Increase</u>

Plaintiff argues that AIG's share repurchase program and increased dividend payment both constituted corporate waste because they depleted the Company's cash reserves at a time that the Board members knew or should have known that AIG would inevitably face a liquidity crisis and, in the case of the share repurchase, at a time when the Board members knew or should have known that the share price would decline once the market learned of the Company's exposure to the subprime mortgage market.  In order to excuse demand on grounds of waste under Delaware law, the Complaint must allege particularized facts that lead to a reasonable inference that the director Defendants authorized "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has

received adequate consideration."  Brehm v. Eisner, 746 A.2d 244, 263 (Del. 2000).  To meet

this stringent test, a plaintiff must "overcome the general presumption of good faith by showing

that the board's decision was so egregious or irrational that it could not have been based on a

valid assessment of the corporation's best interests."  White v. Panic, 783 A.2d 543, 554 n.36

(Del. 2001).  These claims are analyzed according to the Aronson test.

        The actions in question occurred before Liddy, Johnson and Dammerman joined

the Board and, accordingly, there are no grounds to create a reason to doubt their

disinterestedness with respect to these claims.  Nor are there grounds to create a reason to doubt

Orr and Tse's disinterestedness, for the reasons stated above: Plaintiff has failed to plead

particularized facts alleging that either of these June 2009 Directors knew or should have known

that the Company's exposure to the subprime mortgage market would cause it to suffer

tremendous losses and face a liquidity crisis.  Accordingly, Plaintiff's Complaint fails on the first

prong of the Aronson test.

        Plaintiff argues, however, that demand is excused on the second prong of the

Aronson test: that the challenged transaction was not a valid exercise of business judgment.

Aronson, 473 A.2d at 813.  Plaintiff has not pleaded any particularized facts indicating that the

Board consciously acted in bad faith when deciding either to increase the dividend or to

repurchase shares.  Plaintiff therefore must show that "the board's decision was so egregious or

irrational that it could not have been based on a valid assessment of the corporation's best

interests."  White, 783 A.2d at 554 n.36.

        A decision to declare or increase a dividend rests "in the discretion of the

corporation's board of directors in the exercise of its business judgment . . . fraud or gross abuse

of discretion" must be shown "before the courts will interfere with the judgment of the board of directors in such a matter." Gabelli & Co. v. Ligett Group Inc., 479 A.2d 276, 280 (Del. 1984). AIG's decision to increase its dividend by a modest ten percent redounded to the benefit of all shareholders equally and presumably, in the short term, made AIG's stock more attractive to investors, thereby heightening demand for the stock, increasing the share price, and potentially lowering the Company's cost of capital. Although Plaintiff baldly alleges that "the dividend declaration was directly tied to the desire to compensate certain Officer Defendants," Plaintiff pleads no particularized facts to render this inference plausible. The Court cannot conclude that this decision was "so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." Accordingly, the Court concludes that the Complaint fails to satisfy the second prong of the Aronson test because it does not create a reasonable doubt that the challenged transaction was a valid exercise of business judgment, and Plaintiff's claim related to the dividend declaration is dismissed for failure to make a pre-suit demand.

Plaintiff's claim that the stock repurchase program constituted waste depends on the inference that the Board knew that AIG's stock was overvalued at the time it authorized and executed the repurchases. For the reasons stated above, this claim cannot satisfy the first prong of the Aronson test as to at least five of the June 2009 Directors and, accordingly, the Court considers whether the repurchase program is protected by the business judgment rule or, to the contrary, is "so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." White v. Panic, 783 A.2d 543, 554 n.36 (Del. 2001).

This Court previously dismissed a similar claim on the grounds that the plaintiffs

had failed to plead any particularized allegation regarding what motive the directors of a public

company might possibly have to repurchase shares that they knew were overvalued and were

likely to fall in price.  In re Morgan Stanley, 542 F. Supp. 2d 317, 328 (S.D.N.Y 2008) ("The

lack of any particularized allegation as to motive [] derails any attempt by Plaintiffs to establish a

substantial likelihood of liability with respect to Plaintiffs' Section 10(b) claim.  Moreover,

without any particularized allegation pointing to improper motive, the [Complaint] also fails to

create a reasonable doubt with respect to business judgment even if Aronson were to apply.");

see also In re Citigroup, 964 A.2d at 137 ("Other than conclusory allegations, plaintiffs have

alleged nothing that would explain how buying stock at the market price . . . could possibly be so

one-sided that no reasonable and ordinary business person would consider it adequate

consideration.").  Here, Plaintiff's allegation that the Board was motivated by a desire to

maintain a facade of insider confidence despite the troubling signs in the marketplace for

companies exposed to the subprime mortgage market is devoid of any particularized facts to

create a doubt that the Board acted properly that would be sufficiently reasonable to place the

decision outside the protection of the business judgment rule.  See South Cherry Street, LLC v.

Hennessee Group LLC, 573 F.3d 98, 109 (2d Cir. 2009) ("in attempting to show that a defendant

had fraudulent intent, it is not sufficient to allege goals that are possessed by virtually all

corporate insiders, such as the desire to . . . sustain the appearance of corporate profitability . . .

or the desire to maintain a high stock price in order to increase executive compensation")

(internal quotation marks and citations omitted).

   Plaintiff argues, ex post, that the Company's subsequent stock offering at a lower

share price than the average repurchase price both demonstrates the folly of the repurchase

program and implies that the program must have been carried out in bad faith.  Yet the latter

proposition does not follow from the former.  In re Caremark Int'l, 698 A.2d at 967-68.

Although the Court recognizes that other district courts have found plausible Plaintiff's theory

that a corporate board, in bad faith, would authorize a share repurchase program despite its

knowledge that the shares were overvalued in order to maintain a false appearance of prosperity,

see In re Countrywide, 554 F. Supp. 2d at 1082 ("the repurchase program could properly be

viewed as an attempt to keep the ball rolling – i.e. to propel the company forward . . . for a period

of time before the weight of the loan origination practices began taking its toll on the company's

operation and the value of its stock"), the Court concludes that those decisions arose in

exceptional circumstances not present here and that their holdings are contrary to the thrust of the

guidance from Delaware courts applying Delaware law.  See In re Citigroup, 964 A.2d at 137

(dismissing a "claim for waste for the Board's approval of the stock repurchase" because it

"utterly fails to state a claim").

        In sum, Plaintiff's claims for waste of corporate assets predicated upon the share

repurchase and dividend increase (included in Count IV of the ACC) are dismissed for failure to

satisfy the requirements of Federal Rule of Civil Procedure 23.1.

        Plaintiff's Waste Claim: Unwinding the CDS Portfolio

        In January 2009, aided by the funds received in the government bailout, AIG

began to unwind its CDS portfolio, and in doing so it often paid a full 100 cents on the dollar to

its counterparties.  (ACC ¶ 279.)  Plaintiff alleges that the Defendants responsible for this process

wasted corporate assets because they "took no steps to . . . assure that [the Company] received

the best settlement terms from its counterparties."  (ACC ¶ 279.)  The Court analyzes this

argument under the Aronson standard.

Plaintiff has not alleged any particularized facts to create a reasonable doubt that either Orr, Feldstein, Miles, Bollenbach, or Dammerman could exercise disinterested and independent judgment with respect to this claim.  Nor has Plaintiff pleaded any particularized facts indicating that the Company's decisions with respect to this process do not merit the protection of the business judgment rule.  A credit default swap is a contract (ACC ¶ 133), and Plaintiff's pleading does not allege any particularized facts suggesting that AIG did anything other than honor its contractual obligations when unwinding its CDS portfolio.  A corporate board's decision to honor the corporation's contractual obligations certainly is not a business decision "so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests."  White, 783 A.2d at 554 n.36.  Accordingly, the Complaint fails to satisfy the second prong of the Aronson test because it does not create a reasonable doubt that the challenged transaction was a valid exercise of business judgment, and this claim (included in Count IV of the ACC) is dismissed for failure to make a pre-suit demand.[15]

Plaintiff's Waste Claim: Individual Compensation

Plaintiff asserts waste claims with respect to three individual compensation packages: the severance package granted to former AIGFP President Cassano; the severance package granted to former AIG Chief Executive Officer Sullivan; and the compensation package granted to former AIG Chief Executive Officer Willumstad.  Plaintiff argues that there is a

---

[15]   In light of this conclusion, the Court need not consider Plaintiff's allegation that Liddy, Johnson and Offit did not act solely in AIG's best interests with respect to unwinding the CDS portfolio due to their alleged ties to AIG counterparties Goldman Sachs and Wachovia Bank.

reasonable doubt that a majority of the Board would exercise independent and disinterested judgment with respect to this claim, on the ground that a majority of the directors could face a substantial likelihood of liability for authorizing transactions that constitute corporate waste. Plaintiff has not pleaded any particularized facts to support an inference that the Board acted in bad faith and, accordingly, the Court's application of the two-pronged Aronson test focuses entirely on whether the compensation decisions were protected by the business judgment rule or, alternatively, were "so egregious or irrational that [they] could not have been based on a valid assessment of the corporation's best interests." White, 783 A.2d at 554 n.36.

Under Delaware law, corporate boards have broad discretion to set executive compensation, and "courts rarely second-guess directors' compensation and severance decisions because the size and structure of executive compensation are inherently matters of judgment." Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Raines, 534 F.3d 779, 791 (D.C. Cir. 2008) (applying Delaware law). However, a plaintiff may state a claim for waste related to the payment of outsized executive compensation when "a decision of the directors on executive compensation is so disproportionately large as to be unconscionable and constitute waste." In re Citigroup, 964 A.2d at 138 (internal quotation marks and citation omitted).

### Cassano's Severance Package

Joseph Cassano served as the President of AIG Financial Products from 1998 through his resignation in March 2008. Plaintiff alleges that on March 31, 2008, after AIG had recognized multi-billion dollar losses from AIGFP, the Board approved a voluntary separation agreement with Cassano that provided that his termination would be considered "without cause." (ACC ¶ 291.) This determination allowed Cassano to receive, according to Plaintiff, "an

astonishing $43 million," including payments due under the AIG Financial Products Corp. 2007 Special Incentive Plan.  (ACC ¶¶ 292-94.)  Plaintiff alleges that this determination cannot be protected by the business judgment rule in light of the numerous indicators in March 2008 of the ruinous impact on AIG of Cassano's tenure.  These indicators included the disclosure in the 2007 Form 10-K, issued on February 28, 2008, that AIG's CDS portfolio had declined by $6 billion more than previously announced in the February 11 Form 8-K.

The Court takes judicial notice of AIG's 2008 Form 10-K, which reports that, "[d]ue to the significant losses recognized by AIGFP during 2008, the entire amount of the $563 million accrued under AIGFP's various deferred compensation plans and special incentive plan was reversed in 2008."  (Allerhand Decl., Ex. 22, at 118.)  Plaintiff concedes that this disclosure indicates that AIG did not pay $34 million of Cassano's alleged $43 million severance package.  (Pl.'s Opp. p. 49, n.49.)  The payment differential demonstrates that the severance package the Board approved for Cassano left the Board considerable flexibility to reduce the ultimate payout to Cassano if it believed that circumstances warranted such a reduction.

Plaintiff argues that the Court cannot take judicial notice of AIG's 2008 Form 10-K because it was not cited in the Complaint.  However, Plaintiff states in the Complaint that its allegations are based in part on AIG's public SEC filings, including its Forms 10-K (ACC ¶ 46), and such documents are amenable to judicial notice.  Citadel Equity Fund Ltd. v. Aquila, Inc., 168 Fed. App'x 474, 476 (2d Cir. 2006).  Plaintiff also argues that, even if the Court were to find that the special incentive plan payments have been reversed, the potential for waste of corporate assets remains because these payments could be reinstated in the future.  The speculative possibility of a future payment, however, is an inadequate basis to support a claim for waste, and

Plaintiff has not pleaded any particularized facts to suggest that such reinstatement is contemplated.  The Court cannot conclude that the flexible severance package and ongoing consulting arrangement offered to Cassano, which permitted the Board to cancel the $34 million incentive plan payment that composed the bulk of the announced $43 million package, is "so disproportionately large as to be unconscionable and constitute waste."  In re Citigroup, 964 A.2d at 138.  Accordingly, applying the Aronson test, the Court concludes that the Board's approval of Cassano's severance package does not render the directors so substantially likely to face liability for a corporate waste claim as to vitiate their disinterestedness or independence, nor does it create a reason to doubt that the challenged transaction was a valid exercise of business judgment.[16]

### Sullivan's Severance Package

Martin Sullivan served as AIG's CEO between 2005 and June 2008.  He announced his departure one week after the Securities Exchange Commission and the Department of Justice each announced investigations into wrongdoing at AIG.  The Board permitted Sullivan to depart "with good reason" (as opposed to "for cause"), which allegedly entitled him to a severance package of $33-$47 million.  (ACC ¶¶ 293-296.)  Plaintiff alleges that this payment cannot be protected by the business judgment rule in light of the numerous indicators in June 2008 of the ruinous impact on AIG of Sullivan's tenure.  These indicators included the billions of dollars of announced losses in the CDS portfolio and the initiation of multiple government investigations.

---

[16]    It bears noting that, in analyzing Plaintiff's compensation-based claims (including the claims related to the retention bonuses discussed further below), the only question before the Court is whether it would have been futile for Plaintiff to make a demand of the June 2009 Directors regarding these claims.

For the reasons stated above, the Court takes judicial notice of AIG's June 5, 2009, Proxy Statement, which reveals that "consistent with a comprehensive assessment of expenses and compensation being undertaken by AIG, termination arrangements for Mssrs. Sullivan and Bensinger are being reviewed, and no payments will be made pending completion of the review." (Allerhand Decl., Ex. 23, at 61.)  This severance package, therefore, similarly contained sufficient flexibility to allow the Board to reduce the ultimate payout to Sullivan if circumstances warrant such a reduction.[17]  Accordingly, applying the Aronson test, and for the reasons stated above, the Court concludes that Sullivan's severance package does not render the directors substantially likely to face liability for a corporate waste claim, nor does it create a reason to doubt that the challenged transaction was a valid exercise of business judgment.

### Willumstad's Employment Agreement

Robert Willumstad was the Chairman of AIG's Board from November 2006 through September 18, 2008.  (ACC ¶ 56.)  He replaced Martin Sullivan as the Company's CEO on June 15, 2008, and served in that capacity until September 18, 2008, when he was replaced by Edward Liddy as part of the September 2008 Government Bailout.  Plaintiff alleges that "in connection with his appointment [as CEO], Willumstad received a one-time grant of $24.5 million in AIG stock, a stock option award of $12 million, and a salary of $1 million per year with a guaranteed bonus of $4 million for 2008." (ACC ¶ 297.)  Plaintiff argues that this

---

[17]     The question of Sullivan's ultimate payout apparently remains under consideration by the Board.  The Court notes that, in the event Plaintiff believes that the Board's ultimate decision regarding Sullivan's payout is actionable, then it must bring a separate claim to challenge that decision, which would be a separate Board action from the Board's decision to award the flexible severance package that is the subject of the current claim.

compensation package cannot be protected by the business judgment rule because Willumstad had served "as head of the very Board which had so woefully failed to implement internal controls, adequately reserve for losses, and ensure the Company's liquidity."  (ACC ¶ 297.)

The SEC filings of which the Court takes judicial notice demonstrate that the grant of $24.5 million of restricted shares was rescinded by mutual agreement between AIG and Willumstad (Allerhand Decl,. Ex. 23, at 42-44) and the $12 million stock option award is essentially worthless due to the plunging fortunes of AIG's shares (Allerhand Decl,. Exs. 23, 24). Plaintiff's Complaint makes clear that, at the time Willumstad was appointed, AIG was a company in crisis, having announced billions of dollars in losses, lost its CEO to resignation, and become the subject of recently commenced government investigations.  The compensation package largely consisted of stock and stock options and was thus tied tightly to the Company's future performance.  Plaintiff has not pleaded any particularized facts indicating that this package was "so disproportionately large as to be unconscionable and constitute waste," and it appears on the basis of the facts that have been pleaded and the filings of which the Court takes judicial notice that the Board's determination to offer this compensation package was within the broad discretion afforded to the Board to set executive compensation under Delaware law.  See Brehm v. Eisner, 746 A.2d 244 (Del. 2000).  Accordingly, applying the Aronson test, the Court concludes that Willumstad's compensation package does not render the directors substantially likely to face liability on a corporate waste claim, nor does it create a reason to doubt that the challenged transaction was a valid exercise of business judgment.

Plaintiff's Waste Claim: The Retention Bonuses

On December 1, 2007, AIG agreed to grant "retention bonuses" to approximately

130 AIGFP employees, which would be paid in December 2008 and December 2009.  (ACC ¶¶ 272, 301.)  Plaintiff argues that these payments constituted waste because they rewarded many of the very employees responsible for the Company's collapse – some of whom the Company intended to terminate – with lavish cash bonuses.  Plaintiff focuses particularly on two actions by members of the Board in relation to these retention bonuses: the March 11, 2008, decision to amend the bonus pool calculation for 2007 to exclude losses from AIGFP's CDS portfolio (ACC ¶¶ 286-89), and the September 2008 decision to honor the Company's agreement to pay the retention bonuses (ACC ¶ 273).  However, Plaintiff alleges that only two of the June 2009 Directors were responsible for the March 11, 2008, decision (ACC ¶¶ 286-89; Pl.'s Opp. 47-48).  The Court therefore concludes that there is no reason to doubt that a majority of the June 2009 Directors could face a substantial likelihood of liability for that decision.

Plaintiff also has not pleaded any particularized facts indicating that, once AIG had agreed to the retention bonuses, it was not contractually obligated to honor its commitment (as it announced in September 2008), a point which Plaintiff's Complaint essentially concedes. (ACC ¶ 274.)  A corporate board's decision to honor its contractual obligations is certainly protected by the business judgment rule and therefore would not expose the Board members to a substantial likelihood of liability.  Plaintiff has not pleaded any particularized facts that create any other reasonable doubt that a majority of the June 2009 Directors would exercise independent and disinterested judgment with respect to this claim.  Accordingly, the Court turns to the second prong of the Aronson test.  In light of the challenging environment in the financial markets that prevailed at the time, and the necessity to retain personnel in the near-term to navigate those challenges, the Court concludes that the decision to offer retention payments to

personnel that, in management's view, were valuable to the Company, does not appear to be one which "no person of ordinary, sound business judgment could conclude [] represent[s] a fair exchange."  Steiner v. Meverson, No. 13139, 1995 WL 441999, *1 (Del. Ch. July 19, 1995). Once the retention agreements were signed, it appears from the Complaint that AIG was contractually obligated to pay them, irrespective of the buyer's remorse or financial difficulties the Company experienced subsequently.  Accordingly, applying the Aronson test, the Court concludes that the retention bonuses do not render the directors substantially likely to face liability for a corporate waste claim, nor do they create a reason to doubt that the challenged transaction was a valid exercise of business judgment.

In sum, Plaintiff's corporate waste claims with respect to the three individual compensation packages and the retention bonuses (included in Count IV of the ACC) are dismissed for failure to satisfy the requirements of Federal Rule of Civil Procedure 23.1.

Plaintiff's Unjust Enrichment and Contribution Claims

The parties agree that Plaintiff's unjust enrichment and contribution claims rise and fall with Plaintiff's other claims discussed above.  Pl. Opp. at 51, n.52.  For the reasons stated above, those claims (Counts I, II, III, and IV of the ACC) are all dismissed for failure to satisfy the requirements of Federal Rule of Civil Procedure 23.1.  Accordingly, Plaintiff's claims for unjust enrichment and contribution (Counts V and VI of the ACC) are dismissed as well.

The Individual Motions to Dismiss

Various individual defendants and groups of defendants have moved pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) to dismiss the claims asserted against them for failure to plead fraud with particularity and/or to state a claim upon which relief could be

granted.  See docket entry nos. 83, 85, 88, 91, 94, 97 and 100.  In light of the Court's dismissal of the Complaint for failure to either make a pre-suit demand or adequately allege demand futility, these motions are terminated.

### CONCLUSION

For the foregoing reasons, AIG's motion to dismiss Plaintiff's Complaint for failure to make a demand on the Board (docket entry no. 75) is granted.  The Complaint is dismissed in its entirety for failure to satisfy the requirements of Rule 23.1 of the Federal Rules of Civil Procedure.  The other motions to dismiss the Complaint that have been filed by various individual defendants and groups of individual defendants (docket entry nos. 83, 85, 88, 91, 94, 97 and 100) are all terminated in light of the Court's conclusion that the pre-suit demand requirement has not been fulfilled.  The Clerk of Court is respectfully requested to enter judgment dismissing the Complaint for failure to make a pre-suit demand or allege demand futility sufficiently and close this case.  This Opinion and Order resolves docket entry nos. 75, 83, 85, 88, 91, 94, 97 and 100.

SO ORDERED.

Dated: New York, New York
       March 30, 2010

LAURA TAYLOR SWAIN
United States District Judge